**FULL GOSPEL TABERNACLE**
**and Jorge Vega, Plaintiffs,**

v.

**COMMUNITY SCHOOL DISTRICT 27,**
**Community School Board 27 of the city of ozone park, Michael Weitz, in his official capacity as Principal of Public School 105 Queens, Sheila McElhatten, in her official capacity Secretary to the Director of Operations, Brenda Isaacs, in her capacity as Community Superintendent of Community School District 27, Kenneth L. Grover, in his official capacity as Deputy Superintendent of Community School District 27, James Egan, Donna Marie Caltabiano, Ernest Brown, Shalom Becker, James G. Adams, Richard J. Altabe, Geraldine Chapey, Steven Greenberg, and James Sanders, Jr., in their official capacity as members of Community School Board 27, and Board of Education of the School District of the city of New York, Defendants,**

**Attorney General of the State of New York, Intervenor.**

**No. 94 CIV. 7906(CSH).**

United States District Court,
S.D. New York.

Sept. 24, 1997.

Joseph P. Infranco, Commack, NY, Mark N. Troobnick, American Center for Law and Justice, Washington, DC, for Plaintiffs.

Paul A. Crotty, Corp. Counsel of the City of New York, New York, NY, Alan M. Schlesinger, Asst. Corp. Counsel, of Counsel, for Defendants.

Dennis C. Vacco, Atty. Gen. of the State of New York, New York, NY, Jeffrey I. Slonim, Asst. Atty. Gen., of Counsel, for Intervenor Attorney General.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Plaintiffs, a church and its pastor,[1] seek access after school hours to a public school located in Community School District 27 to conduct religious worship services. Defendants, the Board of Education of the School District of the City of New York ("Board of Education"), Community School District 27, and certain of its officers and employees, have denied plaintiffs access to school facilities on the ground that N.Y. Educ. Law § 414, and the Board of Education's policy implementing that law, prohibit the use of school facilities for religious worship services. Plaintiffs initiated this suit pursuant to 42 U.S.C. § 1983, alleging that the defendants' policy, and the law on which it is based, violate the First and Fourteenth Amendments to the United States Constitution.

Plaintiffs now move for summary judgment granting them the relief they seek in their complaint, namely, a declaratory judgment and permanent injunction preventing the defendants from denying plaintiffs access to school district facilities because they intend to use those facilities to hold religious worship services. The defendants cross-move for summary judgment, asserting that § 414 is constitutional on its face and as applied to the plaintiffs. Defendants also argue that allowing the plaintiffs to use public school facilities for religious worship services would violate the Establishment Clause of the First Amendment.

1. Plaintiffs' motion to substitute Jorge Vega, the new pastor of Full Gospel Tabernacle, for Robert Castro as a party to this action is granted. The Clerk of the Court is directed to amend the case caption accordingly.

For the reasons set forth below plaintiffs' motion is denied and defendants' motion is granted.

## I.

Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering such a motion, "a district judge must view the evidence in the light most favorable to the nonmoving party and must draw all inferences in favor of that party." *Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 382 (2d Cir.1996). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Accordingly, summary judgment is warranted where, "after adequate time for discovery ... [the nonmoving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## II.

The following facts are undisputed.

Full Gospel Tabernacle ("Full Gospel") is a Christian church currently meeting in a building owned by the church in Far Rockaway, New York. In late April 1994, Full Gospel determined that an alternative venue was needed for Sunday worship services to accommodate the church's growing membership. Accordingly, on May 6, 1994, Reverend Robert Castro, the pastor of Full Gospel Tabernacle, filed an application with Public School 105 Queens ("P.S.105"), a school located within Community School District 27 ("CSD 27"), to rent the school's auditorium, classrooms, and cafeteria for each Sunday in June. Kenneth Grover, Deputy Superintendent of CSD 27, denied the application on May 16, 1994, citing Board of Education Standard Operating Procedure 5.9 (hereinafter referred to as "SOP 5.9"), which provides in part that "[n]o outside organization or group may be allowed to conduct religious services or religious instruction on school premises after school." [2]

Reverend Castro applied again in late May 1994 to use the facilities of P.S. 105 every Sunday in July. Again his application was denied. Full Gospel then retained legal counsel, and filed the instant action on November 2, 1994.

Through discovery, plaintiffs learned that several other churches in the area had been allowed to conduct religious activities in school district buildings after school hours pursuant to permits issued by CSD 27.[3]

In October 1993, CSD 27 granted Rita Speller, pastor of the Deliverance Temple Church, a permit to hold a Halloween party at P.S. 155. Following the Halloween party, Reverend Speller applied for, and received,

**2.** The full text of SOP 5.9 is as follows:

No outside organization or group may be allowed to conduct religious services or religious instruction on school premises after school. However, the use of school premises by outside organizations or groups after school for the purpose of discussing religious material or material which contains religious viewpoint or for distributing such material is permissible.

This regulation purports to implement N.Y. Educ. § 414, *see infra.*

**3.** The following organizations were also granted permits to use school facilities after school hours: American Legion for a County Convention Awards Assembly; Dance Dimension for dance recital rehearsals; the Department of Sanitation for basketball; Belle Harbor Property Owners Association for a Board of Directors Meeting; Rockaway Action for Mural Painting; Mercaz Hatorah for a basketball program; Congressman Schumer for a Town Hall meeting; Queens Kiwanis Club Girls Softball Team; Tappin–Feet for a dance recital; Local 372 for a union meeting; LWG Co-op Inc. for a shareholder's meeting; ARYA SAMAJ USA for a cultural evening; Eye of Tiger Karate for a karate tournament. CSD 27 has also granted permits to the Church of St. Paul, the New Hope Baptist Church, the Salvation Tabernacle and the Way of Life Gospel Center for gospel recitals. A permit was also issued to Rabbi Shlomo Volner for a Purim party. Pl. Rule 3(g) Stmt., ¶ 10.

permits to use the school facilities on Sundays and some weekday evenings almost every week from November 1993 through November 1994. Although Reverend Speller's initial application listed the activity as a Halloween party, no description of the activities to be conducted was included on subsequent permit application forms, and according to Reverend Speller's testimony, no one from the school district ever inquired about her intended use of the facilities. Speller Dep. at 18. Each permit was approved by Sheila McElhatten, secretary to the Director of Operations for CSD 27.

Reverend Speller testified that she used the school facilities to conduct the worship services of the Deliverance Temple Church. Speller Dep. at 26–27. On Sundays, she would preach, teach the Bible to her congregation and engage in prayer. Speller Dep. at 7–8. On weekday evenings the facilities were used for a variety of activities, including a religious play, inspirational music and dance, and Bible discussion groups. Speller Dep. at 9–12. In November 1994, Reverend Speller was told she could no longer use the school's facilities because it had come to the attention of school officials that she was conducting religious services on the premises. Speller Dep. at 23.

In June and July 1994, CSD 27 granted Lisa and Rubin Mitchell, pastors of the Jesus Family Fellowship, permits to use the auditorium of Junior High School 198 every Tuesday and Sunday in July and August 1994. Reverend Lisa Mitchell described the five services they held at JHS 198 as follows:

We would come in and have what's called a group prayer, congregational prayer. Then we would go into praise and worship, sing different praise and worship songs accompanied by music. From there, Reverend Mitchell, he would get up and deliver the message, the service for that evening.

Mitchell Dep. at 12. Following Reverend Mr. Mitchell's sermon, the Reverends would engage in an "altar call," where they would "invite someone to receive the Lord as their Savior." Mitchell Dep. at 12. The service would then conclude with a closing prayer. Mitchell Dep. at 12. On Sundays, the Mitch-

ells would also conduct religious instruction for children. Mitchell Dep. at 15.

The Mitchells testified that they informed McElhatten at the time they applied for the permit that they intended to use the school facilities for church services. Mitchell Dep. at 41. According to their testimony, McElhatten granted them a permit anyway, after concluding that the Mitchells' intended purpose fell within the second sentence of SOP 5.9, which allows use of school facilities for the "purpose of discussing religious material or material which contains a religious viewpoint or for distributing such material...." Mitchell Dep. at 68. However, on July 21, 1994, Kenneth Grover, deputy superintendent of CSD 27, informed the Mitchells that their permit was rescinded effective immediately, citing SOP 5.9. When the Mitchells demanded an explanation, they were told that McElhatten had issued the permit in error. Mitchell Dep. 55–62.

The district does not deny that these incidents occurred. However, it contends that these permits were erroneously approved due to flaws in the permit application process which have been remedied since a new Director of Operations was hired in September 1994.

Typically, an application to use school facilities after school hours is first reviewed by the custodian and the principal for the school which the organization seeks to use. Brawer Decl., ¶ 8–10. The application is then forwarded to the district office for review and possible approval. Brawer Decl., ¶ 10. Through the fall of 1994, this review at the district level was performed by McElhatten as secretary to the Director of Operations for CSD 27. Brawer Decl., ¶ 11.

However, for most of 1994, the position of Director of Operations for CSD 27 was vacant. Brawer Decl., ¶ 7. When a new Director of Operations was hired for CSD 27 in September 1994, he discovered that McElhatten had granted several permits without any description of the activity and, in some cases, like those described above, for uses not permitted by Board of Education regulations. Brawer Decl., ¶ 12. To remedy this problem on a temporary basis, Grover in-

structed McElhatten in the Fall of 1994 to forward any unusual applications to his office for review. Brawer Decl., ¶ 13.

Since December 1994, the Director of Operations for CSD 27 reviews all permit applications personally, to ensure that all activities are fully described on the application and that no application is granted for an activity prohibited by Board of Education regulations. Brawer Decl., ¶ 20. In addition, a memorandum was sent to all principals and custodians in the district reminding them that SOP 5.9 prohibits the use of school facilities for religious worship services. Brawer Decl., ¶ 23. Since enacting these procedures, the district has been successful in ensuring that school facilities are not used for religious worship services or instruction, and permits have been denied when such use was requested. Brawer Decl., ¶ 26.

Regardless, plaintiffs argue that the district's refusal to give Full Gospel access to school district facilities for religious worship services, in light of the other religious and secular activities which have taken place in school district buildings, violates the Free Speech Clause and the Free Exercise Clause of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment. In response, defendants argue that the district's policy and § 414 are constitutional on their face, and as applied to the plaintiffs, and that granting plaintiffs the relief they request would violate the Establishment Clause of the First Amendment.

### III.

"Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense and Educational Fund,* 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985). In recognition of this principle, the Supreme Court has articulated a forum analysis, identifying three categories of public property for free speech purposes. An individual's right to speak on public property is thus "largely dependent on the nature of the forum in which the speech is delivered." *Bronx Household of Faith v. Community School District No. 10,* 127 F.3d 207, 211 (2d Cir.1997).

First, there are traditional public forums, such as streets and parks, which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Education Assoc. v. Perry Local Educators' Assoc.,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). The second category, referred to in the caselaw as designated public forums, "consists of public property which the State has opened for use by the public as a place for expressive activity." *Id.* Content-based exclusions from both traditional and designated public forums must be necessary to serve a compelling state interest and narrowly drawn to achieve that end. *Id.* 45–46, 103 S.Ct. at 954–56. The third category, nonpublic forums, includes public property which is not by tradition or designation a forum for public communication. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955–56.

In addition, the Second Circuit has recognized a sub-set of designated public forums termed limited public forums. *See, e.g., Deeper Life Christian Fellowship v. Board of Education,* 852 F.2d 676, 679 (2d Cir.1988). This sub-category includes property designated by the government for use by certain groups or for the discussion of certain subjects. *Perry,* 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7; *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448–49. As to those particular groups and subjects, the forum is an open one, and any regulation based on content must be narrowly tailored to serve a compelling government interest. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955–56. However, "[u]nder the limited public forum analysis, property remains a nonpublic forum as to all unspecified uses, and exclusion of uses—even if based upon subject matter or the speaker's identity—need only be reasonable and viewpoint-neutral to pass constitutional muster." *Deeper Life,* 852 F.2d at 679–80 (citations omitted). "Where the proposed use falls outside of the limited forum, the State is subject

to only minimal constitutional scrutiny." *Bronx Household of Faith,* 127 F.3d at 211 (citations and internal quotations omitted).

■ Both parties agree that a public elementary school is not a traditional public forum. *See Deeper Life,* 852 F.2d at 679 ("[P]ublic elementary schools are not, as to the general community, traditional public fora."). However, plaintiffs argue that CSD 27 school facilities have become designated public forums, either by virtue of § 414 or by the school district's practice of allowing a wide variety of secular and religious groups to use the facilities on a regular basis. Defendants dispute this characterization of the school facilities and argue that the facilities are only limited public forums, from which certain subjects, including religious worship services, have been constitutionally excluded. Since the level of scrutiny applied to plaintiffs' claims depends on the type of forum at issue, I must first resolve this threshold dispute.

Plaintiffs argue that § 414 of the New York Education Law designates public school facilities as open public forums. In support of this argument, plaintiffs quote portions of the statute, which states that school facilities may be used for "the purpose of instruction in any branch of education, learning or the arts" and for "holding social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community...." N.Y. Educ. Law § 414(1)(a), (c). According to plaintiffs, this broad language reflects the legislature's intent to designate public schools as open public fora.

However, the statute also specifically lists eight categories of permissive use. N.Y. Educ. Law § 414(1)(a)–(j). If the language quoted by the plaintiffs, standing alone, created an open public forum, the remainder of the statute would be rendered meaningless. It is well-settled that reading a statute in this manner is disfavored. *Allen Oil Co. v. Commissioner of Internal Revenue,* 614 F.2d 336, 339 (2d Cir.1980) ("Normally, a statute must if reasonably possible, be construed in a way that will give force and effect to each of its provisions rather than render some of them meaningless.").

Moreover, a number of activities are specifically excluded from the list of permissible purposes.[4] For example, school facilities may not be used for meetings or entertainment which are exclusive or not open to the general public, or which are being held for a commercial purpose. N.Y. Educ. Law § 414(1)(c)–(d). In addition, meetings sponsored by political organizations are not permitted unless specifically authorized by the district or the board of education. N.Y. Educ. Law § 414(1)(e). While a public school can be used for graduation exercises held by not-for-profit schools, that use is

---

4. A more complete excerpt of § 414 follows:

The trustees or board of education of each district may, subject to regulations adopted as above provided, permit the use of the schoolhouse and rooms therein, and the grounds and other property of the district, when not in use for school purposes or when the school is in use for school purposes if in the opinion of the trustees or board of education use will not be disruptive of normal school operations, for any of the following purposes:

(a) For the purpose of instruction in any branch of education, learning or the arts.

(b) For public library purposes, subject to the provisions of this chapter, or as stations of public libraries.

(c) For holding social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community; but such meetings, entertainment and uses shall be non-exclusive and shall be open to the general public.

(d) For meetings, entertainments and occasions where admission fees are charged, when the proceeds thereof are to be expended for an educational or charitable purpose; but such use shall not be permitted if such meetings, entertainments and occasions are under the exclusive control, and the said proceeds are to be applied for the benefit of a society, association or organization of a religious sect or denomination, or of a fraternal, secret or exclusive society or organization....

The statute goes on to authorize use of public schools as polling places, and for civic forums and community centers, places of instruction for the mentally retarded, athletics, child care services during non-school hours, and "graduation exercises held by not-for-profit schools, *provided that no religious service is performed."* § 414(1)(e)–(j) (emphasis added).

conditioned upon no religious service being performed. § 414(1)(j); *see* n. 4 *supra.*

Thus, reading the statute as a whole, I conclude that § 414 does not designate public school facilities as open public forums, but rather creates a limited public forum. This conclusion is reinforced by school district policy, expressed in SOP 5.9, which specifically excludes religious worship services as a permissible use. *See Bronx Household of Faith,* 127 F.3d at 212–13 (holding that the limitation imposed by SOP 5.9 "is characteristic of a limited forum, for it represents the exercise of the power to restrict a public forum to certain speakers and to certain subjects.").

█ In the alternative, plaintiffs argue that defendants have created an open forum by practice by allowing a wide variety of secular and religious groups to use the school district's facilities on a regular basis. I find this argument unpersuasive, given the uncontested facts presented on this motion.

In *Perry,* 460 U.S. at 39, 103 S.Ct. at 951–52, the plaintiffs, a rival teachers' union, challenged the elected union's exclusive right of access to school mail facilities. In support of their access claim, plaintiffs argued that the school mail facilities had become an open forum because of the "periodic use of the system by private non-school-connected groups...." *Id.* at 47, 103 S.Ct. at 955. The Supreme Court rejected this argument:

> If by policy or by practice the Perry School District has opened its mail system for indiscriminate use by the general public, then [plaintiffs] could justifiably argue a public forum has been created. This, however, is not the case. [T]here is no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public. Permission to use the system to communicate with teachers must be secured from the individual building principal. There is no court finding or evidence in the record which demonstrates that this permission has been granted as a matter of course to all who seek to distribute material. We can only conclude that the schools do allow

some outside organizations ... to use the facilities. This type of selective access does not transform government property into a public forum.

*Id.* at 47, 103 S.Ct. at 956.

A similar analysis is appropriate here. It is undisputed that § 414, and the Board of Education procedures implementing the statute, establish some criteria upon which permission to use school facilities is either granted or denied. The school facilities are not open to indiscriminate use by the general public and applications for permits are reviewed by the school principal and custodian, and then again at the district level. Although it is clear that some applications were granted in contravention of Board policy, such departures from declared policy are hardly sufficient to create a contrary policy. Plaintiffs have presented no evidence that permission to use school facilities is granted as a matter of course to all who file an application. *See Cornelius,* 473 U.S. at 804, 105 S.Ct. at 3450 ("Although the record does not show how many organizations have been denied permission ...., there is no evidence suggesting that the granting of the requisite permission is merely ministerial.").

At most the proof shows that access has been granted to some groups. However, as the Supreme Court stated in *Perry,* "[t]his type of selective access does not transform government property into a public forum." 460 U.S. at 47, 103 S.Ct. at 956; *see also Cornelius,* 473 U.S. at 805, 105 S.Ct. at 3450–51; *cf. Widmar,* 454 U.S. at 265–68, 102 S.Ct. at 272–74 (holding that university created open forum through its policy of providing university facilities for the meetings of all registered student groups without qualification). The public elementary schools located within CSD 27 are simply not places that have been "devoted to general, unrestricted public assembly by long tradition or by policy or practice." *Bronx Household of Faith,* 127 F.3d at 212–13.

Thus, I conclude that the school facilities at issue in this case are limited public forums by virtue of § 414 and school district policy.[5]

---

5.  Accordingly, I reject plaintiffs' claim that § 414 and SOP 5.9 are facially unconstitutional since

*See Bronx Household of Faith,* 127 F.3d at 212–13. As such, a speaker may be excluded from using school facilities after school hours "if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose special benefit the forum was created...." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451 (internal citations omitted). Defendants assert that plaintiffs were denied access on the basis of a permissible subject matter distinction, since § 414 does not include religious worship services as a permissible use and SOP 5.9 explicitly prohibits use of the facilities for religious worship services.

However, once access is permitted based on subject matter or speaker identity, the constitutional right of access extends to other entities or speech of a similar character. *Perry,* 460 U.S. at 48, 103 S.Ct. at 956–57; *see also Travis v. Owego–Apalachin School District,* 927 F.2d 688, 692 (2d Cir.1991) ("[O]nce [the government] allows expressive activities of a certain genre [in a limited public forum], it may not selectively deny access for other activities of that genre."). Plaintiff argues that, even if the school district's facilities are considered limited public forums, they have been opened to religious worship services, despite SOP 5.9, as evidenced by the permits granted to Rita Speller of the Deliverance Temple, and Lisa and Rubin Mitchell of the Jesus Family Fellowship. As such, plaintiffs contend that the defendants' refusal to grant Full Gospel a permit to conduct similar religious worship services on school property after school hours amounts to unconstitutional viewpoint discrimination.

The past practice of the school district in granting access to its facilities is a relevant factor in determining whether the school district has opened its limited forum to religious worship services. *See Deeper Life I,* 852 F.2d at 680; *see also Travis,* 927 F.2d at 693. In *Travis,* the school district granted a permit to an organization called "On the Level Music!" to hold a Christmas concert in the middle school auditorium called "A Concert For the King—Christmas in Owego." 927 F.2d at 693. The program consisted of twelve Christian hymns and a Bible reading by the mayor of Owego. *Id.* Several years later, Birthright of Owego, a pro-life pregnancy counseling organization, requested permission to use the middle school auditorium for a magic show by a Christian illusionist. *Id.* at 690. The program was to consist of an ordinary magic show, followed by a short message promoting the Christian gospel. *Id.* at 693. Despite the similarities between the two programs, the school district denied Birthright a permit on the basis that the proposed magic show would involve religious activity. *Id.* at 691.

Birthright and the Christian illusionist, Toby Travis, sued the school district, alleging that the district's refusal to grant them a permit violated their free speech rights. The district court granted plaintiffs summary judgment on their free speech claim. On appeal, the Second Circuit held that the Christmas program had created "at least a limited public forum for fund-raisers with religious themes." *Id.* such, "permitting a fund-raiser with a religious theme while excluding one with a different religious theme is not viewpoint-neutral as a matter of law...." *Id.* at 694. Since the school district failed to provide a constitutionally sufficient explanation for the different treatment, the Court of Appeals affirmed the District Court's grant of summary judgment to plaintiffs. *See also Trinity United Methodist Parish v. Board of Education,* 907 F.Supp. 707 (S.D.N.Y.1995) (holding that school district could not deny permit to church seeking to hold magic show by christian illusionist when it subsequently granted permit to another church for gospel concert).

Plaintiffs argue that similar facts are present here. It is undisputed that the defendants granted permits to the Deliverance Temple Church and the Jesus Family Fellowship and that both organizations held religious worship services and instruction on school property after school hours on a regu-

they "exclude religious speech from an *otherwise open forum* based upon its religious content." Pl. Mem. in Support of Mot. for Sum. Judgmt. at

19 (emphasis added). As discussed in text, CSD 27 public school facilities are not open public forums.

lar basis. Accordingly, relying on *Travis*, plaintiffs argue that the defendants are constitutionally obligated to grant them permission to conduct religious worship services on school property after school hours, since such activity has been permitted in the past.

The instant case is distinguishable from *Travis*. In *Travis*, the defendants asserted that they had genuinely misunderstood the religious nature of the Christmas concert. 927 F.2d at 693. The Court rejected this defense, and charged the defendants with the knowledge that the program was an openly religious affair. *Id.* However, it was critical to the court's analysis that

> [t]here is no evidence in the record that the School District, having learned that it had mistakenly permitted a religious program in violation of its policy, took steps to prevent a similar mistake in the future, and that such corrective measures caused the denial of [plaintiff's] application.

*Id.* Moreover, counsel for the school district in *Travis* could not even guarantee that the school district would deny permission for another Christmas program in the future. *Id.*

Unlike the school district in *Travis*, the Board of Education in the case at bar promulgated a clear policy, binding upon the defendant school district, that prohibits the use of school facilities for religious worship services.[6] It is undisputed that McElhatten, a secretary in the school district office, failed to properly implement this policy by granting a permit to the Deliverance Temple Church without any description of the activity to be conducted and one to the Jesus Family Fellowship, after erroneously interpreting SOP 5.9.[7] In addition, it appears from the record that defendants were not aware that McElhatten had granted permits for religious worship services in violation of SOP 5.9 until plaintiffs brought the matter to the school district's attention.[8] It is undisputed that once school district officials became aware of these violations of district policy, the erroneously issued permits were immediately revoked.

Moreover, review of permit applications was transferred from McElhatten to Kenneth Grover, deputy superintendent of CSD 27, and later permanently transferred to the Director of Operations for CSD 27. In addition, all principals and custodians were reminded by memorandum that SOP 5.9 prohibits use of school premises for religious worship services and that it is their responsibility to ensure adherence to the policy. These school officials were also charged with the responsibility to inquire further about an organization's proposed purpose if that purpose is unclear, by requesting a flyer or other documentation from the organization.[9]

---

**6.** In *Travis*, the court of appeals noted that the school district's policy was to treat applicants whose programs have religious themes on an ad hoc basis. 927 F.2d at 694. As a result, the court of appeals modified the district court's injunction to prohibit denial of access to the *Travis* plaintiffs, "unless the School District expressly adopts a new policy that treats all programs with a religious theme equally." *Id.* Such a policy is present in the case at bar in the form of SOP 5.9. The permit denial in this case was not due to an ad hoc decision in the absence of a clear policy, but rather McElhatten's failure to properly implement the district's policy.

**7.** Plaintiffs also point to permits granted to the Salvation Tabernacle Church and several other churches for gospel concerts as evidence that the school district has opened its facilities to religious worship services and instruction. However, the Second Circuit has held that a concert that consists of gospel and spiritual music is a musical program, not a religious event which opens the forum for other religious activity. *Lamb's Chapel v. Center Moriches Union Free School District*, 959 F.2d 381, 387 (2d Cir.1992), *rev'd on other grounds*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). One could also characterize a gospel concert as music from a religious perspective. *See* SOP 5.9. Although the "sacred concert" held by the Salvation Tabernacle Church included an opening prayer and closing salvation message, these were very brief and did not constitute the bulk of the program.

**8.** It is important to note that plaintiffs' application for a permit was denied by Kenneth Grover, deputy superintendent of CSD 27, not McElhatten.

**9.** Plaintiffs suggest that this type of further inquiry into the religious nature of an organization's proposed purpose would cause an entanglement between church and state. However, in *Bronx Household of Faith*, 127 F.3d at 215, the court of appeals held that the distinction between religious services and the discussion of permissible topics from a religious viewpoint was not a difficult distinction for school authorities to make.

If the school principal or custodian becomes aware that the policy has been violated despite these precautions, they are to report any violations to the district office and send a warning letter to the organization.

Significantly, since these corrective measures were taken, no permits have been issued for religious worship services or instruction, and requests to use school facilities for such activity has been denied. Accordingly, unlike the defendants in *Travis,* defendants in this case "took steps to prevent a similar mistake in the future" once they learned that the policy had been violated. Moreover, in contrast to the corrective measures evaluated unfavorably by Judge Parker in *Trinity, see* 907 F.Supp. at 716, defendants' steps in this case appear to be effective.

In sum, the defendants have not opened a limited public forum for religious worship services by virtue of the fact that permits were granted on two prior occasions for such use, in light of the facts that these permits were granted by an individual who failed to properly implement the district's clear policy against such use, and the district promptly corrected these errors and took effective steps to prevent such a mistake in the future.[10] Since the Second Circuit has already held that SOP 5.9 is a reasonable regulation, *see Bronx Household of Faith,* 127 F.3d at 214–15, plaintiffs' exclusion from school facilities was therefore constitutional, as long as the exclusion of religious worship services is viewpoint neutral.

## IV.

Plaintiffs argue that the exclusion of religious services is unconstitutional viewpoint discrimination, regardless of forum designation. Plaintiffs point out that § 414 al-

lows "instruction in any branch of education, learning or the arts," "social, civic and recreational meetings ... and other uses pertaining to the welfare of the community." Plaintiffs contend that religious worship services and instruction is speech within these categories from a religious, rather than secular, perspective. As such, according to plaintiffs, the exclusion of religious worship services and instruction constitutes unconstitutional viewpoint discrimination.

In support of their argument, plaintiffs rely on *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). In that case, the defendant school district, on the basis of § 414, denied the plaintiff a permit to use school facilities after school hours to show a six-part film on parenting from a Christian perspective. *Id.* 388–89, 113 S.Ct. at 2144–45. The district court and the court of appeals both rejected the plaintiff's claims, holding that the school property was a limited public forum from which activities with a religious purpose had been constitutionally excluded. *Id.* at 389–90, 113 S.Ct. at 2144–45. The Supreme Court reversed, holding that it was unconstitutional viewpoint discrimination to allow school property to be used for the expression of views on family issues and child-rearing, without also allowing the property to be used for the expression of a religious viewpoint on the same subjects. *Id.* at 394, 113 S.Ct. at 2147 ("The film series involved here no doubt dealt with a subject otherwise permissible ..., and it exhibition was denied solely because the series dealt with the subject from a religious standpoint."). Plaintiffs argue that this holding applies equally to the case at bar.

The distinction between content and viewpoint is "not a precise one." *Rosenberger v.*

---

**10.** I recognize that in *Bronx Household* of Faith, the court of appeals observed several times that the school district in that case had never previously rented a school for the religious purposes intended by the plaintiff in that case. *See, e.g.,* 127 F.3d at 212–13 ("What is not permitted under SOP 5.9 is the use of school premises for worship or instruction, and it is important to note that the parties have agreed that District # 10 never has rented a school property for that

purpose.") But I do not read that language as holding or suggesting that a minor school bureaucrat's uninformed and inadvertent permission for such use by other churches, in derogation of district policy, confers upon the plaintiff church at bar a permanent license to hold religious services in public schools. This is the logical conclusion of plaintiffs' argument, but the school district's contrary policy, clearly declared, cannot so lightly be cast aside.

*Rector and Visitors of the University of Virginia,* 515 U.S. 819, 831, 115 S.Ct. 2510, 2517, 132 L.Ed.2d 700 (1995) (university's denial of printing cost funding to student newspaper with Christian editorial viewpoint condemned as viewpoint discrimination). In the case at bar, although SOP 5.9 prohibits the use of school facilities for *religious worship services,* it allows "the use of school premises by outside organizations or groups after school for the purpose of discussing *religious material* or *material which contains religious viewpoint* or for distributing such material." (emphasis added). In *Bronx Household of Faith,* 127 F.3d at 214–16, the Second Circuit held that this distinction is tenable and "not difficult for school authorities to make," *id.* at 215, and that the exclusion of religious worship services does not amount to unconstitutional viewpoint discrimination. I am bound by this very recent appellate decision.[11]

Since the exclusion of religious worship services is reasonable in light of the purposes served by the forum and viewpoint neutral, *see Bronx Household of Faith,* 127 F.3d at 215, plaintiffs' free speech rights were not violated by the defendants' denial of their permit application.

V.

Plaintiffs also assert claims under the Free Exercise and Establishment Clauses of the First Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment. Identical claims were rejected by the Second Circuit in *Bronx Household of Faith,* 127 F.3d at 215–17. Plaintiffs also assert a claim under the Religious Freedom Restoration Act of 1993. However, that claim must be dismissed with prejudice in light of the Supreme Court's determination in *City of Boerne v. Flores,* — U.S. —, —, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624 (1997), that the Religious Freedom Restoration Act is

unconstitutional. *See Bronx Household of Faith,* 127 F.3d at 217.

VI.

For the foregoing reasons, plaintiffs' motion for summary judgment is denied and defendants' cross-motion for summary judgment is granted. Plaintiffs' earlier motion for a preliminary injunction is also denied for the reasons state above.[12] The Clerk of the Court is directed to dismiss the complaint with prejudice.

It is SO ORDERED.

---

**11.** The Second Circuit decided *Bronx Household of Faith* on September 15, 1997.

**12.** Plaintiffs' recent Motion for Ruling is granted. In addition, although plaintiffs' attorneys, Mark N. Troobnick, Esq. and Jay Alan Sekulow, Esq., assert that their motions to appear pro hac vice are also pending, those motions were granted on December 6, 1994.