TRINITY UNITED METHODIST PARISH, Carolyn Rasmussen and Lee D. Gangaware, Plaintiffs,

v.

BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF NEWBURGH, James Gingrich, Manuel Allende, Alfred Blanco, Joseph Fogarty, M. William Lahey, Ronston Lewis, Elaine Magwood, Robert Roth, Richard Sanders, Paul Flippin, Stephen Giordano, and Sheilah Rubin, in their official capacities as members of the Board of Education of the City School District of the City of Newburgh, and Phillip A. Leahy, in his official capacity as Superintendent of the Newburgh Enlarged City School District, Defendants.

No. 94 CV 6890(BDP).

United States District Court, S.D. New York.

Nov. 14, 1995.

710

Joseph P. Infranco, American Center for Law and Justice Commack, NY, for plaintiffs.

Garrett Silveria, Shaw & Silveria, Highland, NY, for defendants.

MEMORANDUM DECISION and ORDER

PARKER, District Judge.

Once again this Court is called on to explore the tension between religious practice and public space. Plaintiffs Trinity United Methodist Parish, Carolyn Rasmussen and Lee D. Gangaware (collectively "the Church") bring this action for monetary, declaratory and injunctive relief against the Board of Education of the City School District of the City of Newburgh, the Newburgh Superintendent of Schools and individual school board members (collectively "the School Board" or "the Board"), because of the Board's refusal to allow the Church to use the school's facilities during nonschool hours for the performance of a magic show which was to include a religious service. The parties have cross-moved for summary judgment on stipulated facts.

## FACTS

New York Education Law § 414 ("§ 414") authorizes local boards of education to open school facilities to the community for various educational, civic, recreational, and social purposes.[1] The users of the facilities must admit the general public. An admission fee may be charged if the proceeds go to a charitable cause that is not a religious, fraternal or exclusive organization. See N.Y.Educ.Law § 414(1)(d).

Pursuant to § 414, the School Board, adopted and later revised, a written policy, Policy No. 7510 ("Policy 7510"), for community use of its school facilities. Policy 7510 sets forth the application procedures, in accordance with § 414, and lists ten purposes for which the facilities may be used. Religious uses are not included and, thus, are not permitted. On September 30, 1992, the School Board also adopted, and later revised, Policy No. 7511 ("Policy 7511"), specifically prohibiting the use of school facilities for religious services and instruction.[2] (Policy 7510 and Policy 7511 are collectively termed "the Policies.")

1. In pertinent part, § 414 provides: 1. Schoolhouses and the grounds connected therewith and all property belonging to the district shall be in the custody and under the control and supervision of the trustees or board of education of the district. The trustees or board of education may adopt reasonable regulations for the use of such schoolhouses, grounds or other property, all portions thereof, when not in use for school purposes or when the school is in use for school purposes ... for such other public purposes as are herein provided ...: (a) For the purpose of instruction in any branch of education, learning or the arts.... (c) For holding social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community; but such meetings, entertainment and uses shall be non-exclusive and shall be open to the general public. (d) For meetings, entertainments and occasions where admission fees are charged, when the proceeds thereof are to be expended for an educational or charitable purpose; but such use shall not be permitted if such meetings, entertainments and occasions are under the exclusive control, and the said proceeds are to be applied for the benefit of a society, association or organization of a religious sect or denomination, or of a fraternal, secret or exclusive society or organization of a religious sect or denomination, or of a fraternal, secret or exclusive society or organization other than organizations or volunteer firefighters or volunteer ambulance workers.... (f) For civil forums and community centers.... 2. The trustees or board of education shall determine the terms and condi-

tions for such use which may include rental at least in an amount sufficient to cover all resulting expenses for the purposes of paragraphs (a), (b), (c), (d), (e), (g) and (i) of subdivision one of this section. N.Y.Educ.Law, § 414 (McKinney 1988 & Supp.1991).

2. Policy 7511, as amended August 31, 1993, reads: As a governmental entity, the School District must neither promote, nor inhibit, individuals in the exercise of religion. To that end, there shall be no prayer or religious instruction during school program time or at school sponsored activities, including graduation ceremonies. Recognizing that the School District has maintained a limited public forum for the exercise of speech by those interested in the school community and has permitted facilities use by nonschool related organizations, it is the policy of this School District that its buildings and premises shall not be used for conducting religious services or religious instruction, except as provided for under the Equal Access Act. This policy is not intended to preclude cultural events at which music with religious references is performed. Neither is this policy intended to restrict the access of religious organizations to express their viewpoint regarding issues as to which the District has created a limited public forum and to promote social events and/or entertainment events pursuant to the District's facilities use policy where the proceeds, if any, are collected for and distributed to non-sectarian charitable or educational organizations.

Under Policy 7510, the School Board has permitted various community organizations to use the school's facilities on numerous occasions since 1988. For example, the Coalition for People's Rights has held a Choir Festival Fundraiser and the New York State School Music Association has sponsored a music festival. Other events have included meetings, magic shows and a halloween party.

In April 1994, the Amazing Grace Apostolic Faith Church of Newburgh conducted a gospel concert using the school's facilities. Amazing Grace had indicated on its application that it intended to use the facilities for a "gospel concert" and agreed to comply with the policies, rules and regulations of the School Board. The application was approved by the school principal. Amazing Grace advertised the gospel concert on local radio as a "Holy Ghost–Filled Concert." The concert opened with a prayer which was followed with ten gospel songs sung by two church choirs. After the singing, a pastor delivered a sermon and closed with an alter call[3] and a prayer. Amazing Grace charged an admission fee. On its application form it indicated that the proceeds were intended to fund the "music ministry of the Amazing Grace Church to outreach community—Donation to Downing Park, etc."

In July 1992, Rasmussen, an active member of Trinity United Methodist Parish, on behalf of her pastor and the Parish, requested permission to use the school facilities on November 8, 1992, for a magic show by the "Christian Illusionist," Toby Travis. Travis' performance was in part to be a religious service, including prayer, music, religious instruction and Christian testimony. At the same meeting at which it considered Rasmussen's request, the School Board adopted Policy 7511. On September 30, 1992, the School Board denied Rasmussen's request "[d]ue to the fact that the program is religious in nature, and conflicts with the Board of Education Policy."

In June 1993, Rasmussen made a second, identical, request to use the school facilities for a performance by Travis, which also was

to include a religious service with prayer, music, religious instruction and Christian testimony. The School Board again denied the request based on its conclusion that the Church's use of the facilities for religious purposes would violate § 414 and Policy 7511.

Thereafter, the Church filed this civil rights action seeking declaratory and injunctive relief and damages pursuant to 42 U.S.C. § 1983. The Church moves for summary judgment on all claims in the complaint, contending that § 414 and the Policies: (1) unconstitutionally restrict its right to free speech; (2) violate its right to freedom of association; (3) excessively entangle the School Board in the business and internal affairs of a religious organization in violation of the Establishment Clause; (4) inhibit the free exercise rights of religious organizations and individuals; (5) deny it equal protection; (6) are void for vagueness; and (7) violate the Religious Freedom Restoration Act of 1993, Public Law 103–141, 107 Stat. 1488.

In its cross-motion, the School Board, in essence, contends that the Policies comport with § 414 and create a limited public forum which constitutionally excludes certain subject matters, including "religious services and religious instruction," and because the Church intends to use the facilities for a religious service, the School Board's denial of its request does not constitute viewpoint discrimination. In addition, the School Board contends that the Policies do not excessively entangle the state with religion in violation of the Establishment Clause, burden the Church's free exercise of religion nor discriminate against the Church on the basis of religion. Finally, the School Board argues that the Policies are not void for vagueness.

## DISCUSSION

### 1. Legal Standard for Summary Judgment

■■■ Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

**3.** An alter call is "an appeal by an evangelist to worshipers to come forward to signify their decision to commit their lives to Christ." Webster's Ninth New Collegiate Dictionary, 1984.

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court's responsibility is to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos*, 831 F.Supp. 1079, 1082 (S.D.N.Y.1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See *McNeil*, 831 F.Supp. at 1082 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam) (other citations omitted)). See also *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991) (citation omitted).

### 2. *Freedom of Speech*

■ The First Amendment does not guarantee unlimited access to government-owned property for purposes of expression and, depending on the nature of the property, the government may regulate access. See *Cornelius v. NAACP Legal Defense and Ed. Fund*, 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3447–48, 87 L.Ed.2d 567 (1985). *Cornelius* established a three-prong test for analyzing governmental restrictions on expressive activity. The first prong requires a determination of whether the speech in question is protected by the First Amendment. The second prong requires an identification of the nature of the forum for the speech. The third requires an assessment of whether the government's exclusion of the speech from the particular forum is justified. See *Cornelius*, 473 U.S. at 797, 105 S.Ct. at 3446.

Because all agree that religious speech is protected by the First Amendment, see *Widmar v. Vincent*, 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981); *Otway v. City of New York*, 818 F.Supp. 659, 661 (S.D.N.Y.1993), the real dispute here is over the second and third prongs of the test.

■ First Amendment law recognizes three types of speech fora, each with its own standard of review. See *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In the traditional public forum, for example, streets and parks, "which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Perry*, 460 U.S. at 44, 103 S.Ct. at 954, the rights of the state to limit expressive activity are sharply circumscribed. For the state to enforce a content-based exclusion, it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.

■ The second category of speech fora is public property that the state has opened to the public for expressive activity. University meeting facilities and a municipal theater, for example, have been held to fall within this second category of "designated public fora." Although a state is not required to retain indefinitely the open character of the facility, as long as it does so it is bound by the same standard of review as applies to the traditional public forum. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955.

■ This Circuit recognizes the subcategory of a "limited public forum" within the category of the designated public forum. A designated public forum may be created for a limited purpose, such as use by certain groups, see *Widmar*, 454 U.S. 263, 102 S.Ct. 269 (student groups), or for the discussion of certain subjects, see *City of Madison, Joint School District v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board business). Specifically, a limited public forum is "created when government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Travis v. Owego–Apalachin School Dist.*, 927 F.2d 688, 692 (2d Cir.1991).

**714**

■ In the case of a limited public forum, the strict scrutiny applied to traditional public forums only applies to entities or genres of a character similar to those the government admits to the forum. See *Travis*, 927 F.2d at 692; *Calash v. City of Bridgeport*, 788 F.2d 80, 82 (2d Cir.1986). "[I]n a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Travis*, 927 F.2d at 692.

■ The third category of fora is public property that is not by tradition or designation a forum for public communication, for example, prisons or school mail boxes, and is governed by different standards. The Supreme Court has recognized that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." See *United States Postal Service v. Greenburgh Civic Associations*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2684, 69 L.Ed.2d 517 (1981). A state may reserve a non-public "forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *United States Postal Service*, 453 U.S., at 131, n. 7, 101 S.Ct. at 2686, n. 7.

Relying on *Lamb's Chapel v. Center Moriches Union Free School District*, 959 F.2d 381, 387 (2d Cir.1992), *rev'd*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), and *Deeper Life Christian Fellowship, Inc. v. Board of Education of the City of New York*, 852 F.2d 676 (2d Cir.1988), the School Board argues that § 414 and the Policies create a limited public forum for specifically delineated purposes—"social, civic and recreational meetings and entertainments," N.Y.Educ. Law § 414,—but exclude political organizations, sectarian groups and religious services and instruction. The School Board reads *Deeper Life* and *Lamb's Chapel* to mean that by confining the use of school facilities to nonreligious purposes, the state indicated its intent to create a limited public forum from which religious uses would be excluded.

*Deeper Life*, 852 F.2d at 680; *Lamb's Chapel*, 959 F.2d at 387.

Although the Church does not concede that § 414 and the Policies create a limited public forum, it argues, citing *Travis*, 927 F.2d 688, that even under the limited public forum doctrine, its speech has been unlawfully excluded because it is of a genre that the School Board has permitted. In *Travis*, the defendant school district, pursuant to § 414, permitted its facilities to be used by numerous community organizations, including an organization called "On the Level Music!" which presented a Christmas program. The defendant, however, denied the plaintiff, a Christian pregnancy counseling organization, permission to use its facilities for a fundraising performance by a Christian illusionist. (Coincidentally, perhaps, the same Christian illusionist involved in this case, Toby Travis.)

*Travis* expressly did not reach the issue of whether § 414 and the school district's policies created an open (i.e., designated) public forum or a limited public forum, because it found the exclusion of Travis' performance unconstitutional under either standard of review. *Travis* held that because the school had previously permitted the Christmas program which contained religious content similar to that contained in the performance of Travis, it had opened the forum to the genre of fund-raisers with religious themes. Thus, even-handedness required that the school district also permit Travis access to its facilities for fund-raising with a religious theme. "Permitting a fund-raiser with a religious theme while excluding one with a different religious theme is not viewpoint-neutral as a matter of law, absent a constitutionally sufficient explanation for the differential treatment." *Travis*, 927 F.2d at 694.

■ *Travis* controls. It is undisputed that the School Board permitted Amazing Grace to use the facilities for a gospel concert that included prayer, a sermon and an altar call and that the proceeds of this event were to be used by Amazing Grace's music ministry and for community outreach. The Church's proposed use of the facilities is essentially the same as the gospel concert. Both included prayer, music, religious in-

struction and Christian testimony and proceeds devoted to religious purposes. Thus, even if the Policies create a limited public forum, the Church's magic show including prayer, music, Christian testimony and instruction, being within the genre for which use has been permitted, cannot be denied access absent a constitutionally sufficient justification.

The School Board urges a different conclusion on several grounds. It first argues that unlike *Travis* it has not permitted the Church's genre of use, namely "religious services and religious instruction." It asserts that the Amazing Grace gospel concert was merely "a musical concert" from a "religious viewpoint." The Board concedes that it would permit the Church to use the facilities for a magic show from a religious perspective, but will not permit a magic show that includes a religious service since to do so would violate Policy 7511.

As support for this distinction, the School Board looks to *Lamb's Chapel*, 959 F.2d at 387, contending that a gospel concert, such as that sponsored by Amazing Grace, did not constitute religious services and instruction. *Lamb's Chapel*, however, did not hold that a gospel concert never constitutes a religious service or religious instruction. It merely held that the gospel concert at issue was not religious because "[i]t took place in a non-religious context and had a non-religious purpose." *Lamb's Chapel*, 959 F.2d at 387. We need not wrestle with the puzzle of whether the Amazing Grace concert took place in a non-religious context or had a non-religious purpose because the parties concede that it included a religious service and religious instruction; it opened with a prayer and closed with a sermon followed by an altar call and a prayer.

The School Board next argues that it denied the Church permission to use the school facilities to avoid an unconstitutional entanglement between church and state. That rationale, however, would have equally precluded Amazing Grace's gospel concert. Moreover, nothing in the Establishment Clause requires the state to exclude a person's speech because the content of that speech is religious in character. See *Gre-*

*goire v. Centennial School District*, 674 F.Supp. 172, 178 (E.D.Pa.1987), *aff'd*, 853 F.2d 917 (3d Cir.1988). Here, Travis' performance would not have occurred during school hours, would not have been sponsored by the school, and would have been open to the public, not just to church members. In addition, the school facilities have repeatedly been used by a variety of private organizations. *Widmar* teaches that where a forum is available to a broad class of speakers, allowing religious speech "does not confer any imprimatur of state approval on religious sects or practices." *Widmar*, 454 U.S. at 274, 102 S.Ct. at 276. See also *Travis*, 927 F.2d at 694 ("having an open-door policy that happens to allow religious speech does not 'endorse' or 'establish' a religion.") (citations omitted).

Finally, the School Board argues it did not knowingly open the school facilities to a religious service and religious instruction by Amazing Grace because Amazing Grace represented on its application form that its program was in compliance with the Policies and the application form on its face did not indicate that the program would include a religious service.

*Travis* rejected a similar argument. There, the defendants argued that they did not anticipate that a Christmas program would have a religious theme. The Court was unpersuaded that the plaintiff's application form for Travis' performance in that case should raise any more suspicion than "On the Level Music!"'s application to use the facilities for a Christmas program. It reasoned that, although a Christmas program may focus only on secular aspects of the holiday, there was nothing in the application for that program that indicated such a limited content. *Travis*, 927 F.2d at 693.

In addition, *Travis* established that to be misled is not to be exonerated. The Court observed that even if the school district genuinely misunderstood the nature of the proposed Christmas program when viewing the application, it was now charged with the knowledge that the program was an openly religious affair. See *Travis*, 927 F.2d at 693. What was critical in *Travis* was the absence of evidence that the school district, having

learned that it had mistakenly permitted a religious program in violation of its policy, took effective steps to prevent a similar mistake in the future, or that any such corrective measures had caused the denial of the plaintiff's application. Counsel for the school district could only assure the Court that he would, if asked, advise in the future against use of the auditorium for another Christmas program but he could not guarantee that the district would heed his advise. See *Travis,* 927 F.2d at 693.

Here, Rasmussen requested use of the facilities by explaining "[m]y church, Trinity United Methodist Parish, is hosting a Christian Illusionist. We would like to be able to present his show to all area churches, Christians and anyone else who may be interested in his show." On its application form, Amazing Grace stated that it intended to use the facilities for a "gospel concert," the proceeds of which would go to "music ministry for Amazing Grace Church to outreach community—Donation to Downing Park, etc." The School Board has not offered any reasonable explanation as to why Rasmussen's request for a performance by a Christian magician would necessarily trigger any more scrutiny than Amazing Grace's application for a gospel concert. The singing of Christian hymns may be entirely secular, but there was nothing in Amazing Grace's application that indicated such a limited content. Both requests were made by churches for programs that facially raised an issue of religion.

The School Board also argues, that to prevent mistakes akin to the Amazing Grace incident, it has taken a number of steps in a good faith attempt to remain in compliance with a somewhat difficult body of law, including reviewing and revising its practices after *Travis,* and revising Policy 7511 to permit speech from a religious viewpoint, but prohibit completely the genre of "religious services and religious instruction," following the Supreme Court's decision in *Lamb's Chapel,* —— U.S. ——, 113 S.Ct. 2141. In addition, since the Amazing Grace concert, the School Board now asks all applicants whose applications appear to present religious issues to confirm that they recognize that the District has a policy prohibiting religious services and

instruction, and that the facilities may be used for the singing of gospel hymns, but may not include religious services or instruction. Finally, the School Board contends that in the future it will deny Amazing Grace use of its facilities unless Amazing Grace can demonstrate that its intended use will not include a religious service or religious instruction.

As important as these steps are, they are not dispositive. There is no guarantee that an application for a religious program would raise an issue of religion on its face. A secular organization might request permission to host a performance by Travis, but indicate on its application that use of the facilities is sought only for a magic show. Moreover, it is not clear that merely asking an applicant whose application raises an issue of religion whether it recognizes that the District has a policy that prohibits religious services and instruction will prevent mistakes, like Amazing Grace's gospel concert, in the future. Amazing Grace itself signed a statement agreeing to comply with the Board's policy and regulations, yet still engaged in religious services and instruction.

The gospel concert occurred and it created at least a limited public forum for entertainment events including prayer, religious instruction, music and religious testimony. This means that the School Board cannot selectively deny access for activities of the same genre, regardless of whether it has created a limited public forum or an open forum. Because I rely for this conclusion on the School Board's past practice, I do not reach the questions of whether § 414 and the Policies constitutionally create a limited public forum or of whether the Church was excluded because of its religious viewpoint.

### 3. *Establishment of religion*

■ *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), established another three-prong test, this one for evaluating Establishment Clause claims. Under the test, a governmental policy will not offend the Establishment Clause if: (1) it has a secular purpose; (2) its principal or primary effect is one that neither advances nor inhibits religion; and (3) it does

not foster an excessive government entanglement with religion. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111.

The Church argues that under *Widmar,* 454 U.S. 263, 102 S.Ct. 269, and *Walz v. Tax Commission,* 397 U.S. 664, 674–75, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970), enforcement of § 414 and the Policies' prohibition against use of the school facilities and the funds collected for religious purposes would excessively entangle the state with religion because the School Board would have to monitor the activities of pervasively sectarian organizations to assure that use of its facilities and the funds collected remained secular.

*Widmar* involved the exclusion of a registered student group desiring to engage in religious worship and religious discussion from the facilities of a state university, which were generally available for the activities of registered student groups. To be sure, *Widmar* noted that "the University would risk greater 'entanglement' by attempting to enforce its exclusion of 'religious worship' and 'religious speech'" than by opening its forum to religious as well as nonreligious speakers, *Widmar,* 454 U.S. at 272, n. 11, 102 S.Ct. at 275–76, n. 11, 70 L.Ed.2d 440 (1981), but our Circuit has held that, with regard to § 414 and policies quite similar to those at issue here:

> *Widmar* ... does not control the result.... As the Supreme Court pointed out in a later case, in *Widmar* it had 'noted that a university campus, at least as to its students, possesses many of the characteristics of a traditional public forum,' thereby subjecting attempts at regulating use to the most exacting constitutional standards as to the forum's intended beneficiaries. While the citizenry residing within a school district may be the intended users of the forum at issue here, public elementary schools are not, as to the general community, traditional public fora.

*Deeper Life,* 852 F.2d at 679 (quoting *Cornelius,* 473 U.S. at 803, 105 S.Ct. at 3449–50). Eschewing strict reliance on *Widmar,* the Court chose to apply what it termed a "limited public forum analysis," *Deeper Life,* 852 F.2d at 679–80, and concluded that the exclusion of religious uses under § 414 and the

subject policies need only be reasonable and view-point neutral to pass constitutional muster.

██ Moreover, even if *Widmar* did apply, the Church has not demonstrated that enforcement of § 414 and the Policies would mean state involvement sufficiently excessive as to violate the Establishment Clause. "The test is inescapably one of degree.... [T]he questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Walz,* 397 U.S. at 675, 90 S.Ct. at 1414.

The entanglement proscribed in such cases as *Lemon, Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) and *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), has in common state assistance provided in a pervasively sectarian environment, in such a form that continuing supervision to ensure the absence of a religious message was essential. Because, in those cases, state assistance was rendered in the form of teachers, who, as opposed to books, could not "be inspected once so as to determine the extent and intent of [their] personal beliefs and subjective acceptance of the limitations imposed by the First Amendment," *Lemon,* 403 U.S. at 619, 91 S.Ct. at 2114, an adequate level of supervision would have required comprehensive and permanent on-site monitoring. See, *Lemon,* 403 U.S. at 619, 91 S.Ct. at 2114; *Meek,* 421 U.S. at 370, 95 S.Ct. at 1765; *Aguilar,* 473 U.S. at 412–13, 105 S.Ct. at 3237–38.

██ Here, in contrast, although enforcement of § 414 and the Policies might occasion some degree of state monitoring, it would be far less comprehensive and permanent than the detailed and daily monitoring required to guard against the infiltration of religious thought in sectarian classrooms that the Supreme Court found to be excessive and enduring entanglement in *Lemon, Meek,* and *Aguilar.* The School Board would be required to do no more than determine whether an applicant's proposed use included religious services or religious instruction and then ascertain the nature of the entity receiv-

ing the funds raised. Making those decisions does not differ substantially from making the type of decision approved in *Mueller v. Allen, Jr.,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), which concluded that determining whether the purpose of instructional books and materials was to inculcate religious tenets, doctrines or worship did not excessively entangle the state in religion.

### 4. Free Exercise of Religion and the Religious Freedom Restoration Act

"To demonstrate an infringement of his free exercise rights, an individual must show 'the coercive effect of the (state) enactment as it operates against him in the practice of his religion.'" *Brandon v. Board of Education,* 635 F.2d 971, 976 (2d Cir.1980) (quoting *School District of Abington Township v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963)), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981). In addition, to demonstrate a violation of the Religious Freedom Restoration Act of 1993, a plaintiff must show that a governmental entity has "substantially burden[ed] a person's exercise of religion." Religious Freedom Restoration Act of 1993, 107 Stat. 1488, 42 U.S.C. § 2000bb–1(a).

Analysis under the Free Exercise Clause does not involve a court in determining the sincerity of one's religious beliefs, see *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), but it does require that the court inquire into the relative importance of a particular religious ritual and the degree to which exercise of that practice is infringed by government action. See, e.g., *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

Here, although religious services are undoubtedly essential to the Church's religious beliefs, the effect of § 414 and the Policies—denying the Church use of the school facilities for religious services—is not the type of coercive restraint imposed by state action proscribed by the Free Exercise Clause. The Church is not forced to choose between neglecting its religious obligations and rendering itself liable for criminal sanctions, as in *Sherbert v. Verner,* 374 U.S. 398,

83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), or ineligible for state benefits, as in *Yoder,* 406 U.S. 205, 92 S.Ct. 1526. See *Brandon,* 635 F.2d at 977. It has not demonstrated that the practice of its religion requires it to present magic shows that include religious services at public schools. Accordingly, the Church's Free Exercise claim is denied.

### 5. Void for Vagueness

A statute is void for vagueness if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Baggett v. Bullitt,* 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964). When a statute touches the area of free expression, the requirements of preciseness are most strictly applied as the government is permitted by the Constitution to regulate only with narrow specificity. See *Keyishian v. Board of Regents,* 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967) (citation omitted). To avoid chilling the exercise of vital First Amendment rights, restriction of expression must be expressed in terms which clearly inform citizens of prohibited conduct and in terms susceptible of objective measurement. See *Keyishian,* 385 U.S. at 604, 87 S.Ct. at 684 (citation omitted).

The Church argues that § 414 and the Policies are unconstitutionally vague because they vest school officials with subjective, *ad hoc* authority to determine what constitutes a "religious purpose" and "religious services and religious instruction." For example, the Church argues, it is unclear whether the Policies would permit a church to use the school facilities for a religious service in which the choir would sing excerpts from Handel's Messiah.

Section 414 and the Policies are not void for vagueness. The terms "religious purpose" and "religious services and religious instruction" have a common meaning such that people of ordinary intelligence— perhaps after some thought—can understand what conduct is prohibited. A performance of Handel's Messiah, for example, need not be a religious service. It depends upon the

context and purpose for which it is performed. "Much of the world's greatest music has some religious connotation but can be enjoyed by people of all religious beliefs as well as people of no religious beliefs" when performed "in a non-religious context" and with "a non-religious purpose." See *Lamb's Chapel*, 959 F.2d at 388. Although some people may attend a religious service because they enjoy the music, in general, attendance connotes identification with a faith, and thus, is enjoyed only by people of a particular religious belief. The Church's void for vagueness claim is denied.

### 6. *Equal Protection*

 Finally, under the Equal Protection Clause, a governmental entity may not "legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute.... [A]ll persons similarly circumstanced shall be treated alike." *Reed v. Reed*, 404 U.S. 71, 75–76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (citations omitted). The distinction drawn by the School Board in denying the Church access to the school facilities—between a gospel concert including a sermon, altar call and prayer and a magic show including a religious service of prayer, Christian testimony and instruction—cannot withstand scrutiny under either a strict scrutiny or reasonable basis test for the reasons stated above in relation to the Church's Free Speech claim. Accordingly, § 414 and the Policies as applied here unconstitutionally deny the Church equal protection of the law.

In conclusion, Plaintiffs' motion for summary judgment on their Free Speech and Equal Protection claims are granted and Defendants' motion for summary judgment dismissing all other claims is granted.

SO ORDERED.