**LIBERTY CHRISTIAN CENTER, INC.,**
**Charles T. Savidge, Roxanne Nicholson,**
**and Stephen Bryant, Plaintiffs,**

v.

**BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF WATERTOWN, Kay S. VanBrocklin, Paul Simmons, Deborah A. Cavallario, Linda S. Parsons, Elizabeth S. Lowe, Jacquelyn A. Schell, Daniel J. Villa in their official capacity as members of the Board of Education of the City School District of the City of Watertown and Warren E. Fargo, in his official capacity as Superintendent of City of Watertown, City School District, Defendants.**

No. 97–CV–610.

United States District Court,
N.D. New York.

June 10, 1998.

McCarthy & Secola, Vincent P. McCarthy, of counsel, New Milford, CT, The American Center for Law and Justice, Jay Alan Sekulow, Brian W. Raum, Stuart J. Roth, Joel H. Thornton, of counsel, Virginia Beach, VA, for plaintiffs.

Conboy, McKay, Bachman & Kendall LLP, Stephen W. Gebo, of counsel, Watertown, NY, for defendants.

New York State School Boards Association, Inc., Jay Worona, of counsel, Albany, NY, for defendants' Amicus Curiae.

## MEMORANDUM, DECISION & ORDER

McAVOY, Chief Judge.

Plaintiffs Liberty Christian Center ("Liberty"), Charles T. Savidge, Roxanne Nicholson and Stephen Bryant brought this action pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, that defendants violated their free speech rights under the First Amendment to the United States Constitution by denying plaintiffs the use of the Watertown High School Cafeteria (the "cafeteria"). On June 27, 1997, this Court preliminarily enjoined defendants from denying plaintiffs' requested use of the cafeteria during non-school hours. Plaintiffs now move for summary judgment on their free speech and equal protection claims. Defendants cross-move for summary judgment dismissing the Complaint.

## I. BACKGROUND

### A. Facts

Liberty is a not-for-profit church incorporated under the laws of Delaware and located in Watertown, New York. Its purpose, in part, is to proclaim the gospel of Jesus Christ and to facilitate fellowship by its members among themselves and with others. Savidge is the administrator of the Church, Bryant is its pastor, and Nicholson is a Liberty member.

Defendants are the Board of Education of the City School District of the City of Watertown (the "Board"), its board members, and its Superintendent (collectively, the "School District" or "defendants"). Watertown High School is within the Board's jurisdiction.

Pursuant to New York Education Law § 414,[1] the Board adopted Policy No. 1500—"Community Use of School Facilities," and Policy No. 1500–R—"Public Use of School Facilities Regulation." Pl.Rule 7.1(f) Stat. Exs. A and B. Policy No. 1500 provides that "[s]chool facilities may be used by district residents for activities which are educational, cultural, social, recreational or civic in nature, primarily for the benefit of district residents and consistent with all applicable state laws." The policy further provides that "[a]ll uses of school buildings and grounds shall be consistent with section 414 of the Education Law." Policy 1500–R lists acceptable and prohibited uses for school facilities, essentially iterating the acceptable and non-acceptable uses provided in Education Law § 414. *See supra* note 1.

At issue in this case are a number of prior events held by various organizations with the permission of the Board.

### The Nancy Honeytree Concert

On August 6, 1993, Faith Fellowship Church ("Faith Fellowship") requested use of the Watertown High School Auditorium (the "Auditorium") on October 21, 1993, for a concert by Nancy Honeytree, a Christian artist. Pl.Rule 7.1(f) Stat. Ex. D. The Board granted the request. The purpose of the concert, according to Faith Fellowship Pastor Tim Grant, was to "preach the gospel," or "let the gospel be known." Pl.Rule 7.1(f) Stat. Ex. E at 70 (Deposition of Tim Grant) (hereinafter "Grant Dep."). The concert featured songs containing Bible passages, and people recited passages of scripture. *Id.* at 69–70. Moreover, Honeytree herself "shared a testimony" during the concert, by which she related to the audience how God came into and changed her life. *Id.* at 71. Those present at the concert were encouraged to change their lives by "receiving Jesus" and Grant asserts that "presenting the gospel" was the central feature of the concert. *Id.* at 71–72.

In granting Faith Fellowship permission to use the Auditorium for the concert, defendants did not ask Grant whether prayer, Bible-recitation, or presentation of the gospel would occur. Grant Dep. at 65–66. The concert was advertised as that of a "Christian recording artist." *Id.* at 66. Faith Fellowship charged an admission fee of $6.00. Pl.Rule 7.1(f) Stat. Ex. D.

### "Local Talent Night"

In June of 1994, Faith Fellowship requested permission for use of the Auditorium on September 23, 1994 for "Local Talent Night," specifically "Christian Music." Pl.Rule 7.1(f) Stat. Ex. F. Defendants approved the request. The event was advertised locally as a "Night of Christian Worship," and advertisements were sent to eighty churches in the Watertown area. Pl.Rule 7.1(f) Stat. Ex. G ¶ 13 (Grant Affidavit). That night, the performers and audience members sang praise and worship songs, Grant said two or three prayers, and Bible passages were recited. Grant Dep. at 81–85. Individuals were invited to accept Jesus Christ as their "Lord and Saviour." *Id.* at 86. Faith Fellowship took up a collection at the event and raised between $150 and $200. *Id.* at 82.

Defendant Warren E. Fargo testified that in retrospect, the "Local Talent Night" event appears to have been a worship service. Pl. Rule 7.1(f) Stat. Ex. C at 36 (Deposition of Warren E. Fargo) (hereinafter "Fargo Dep."). Approximately two weeks later, the audio-visual technician who worked the event told Fargo in a "passing comment" that the

---

1. Section 414 provides for the use of schools and school grounds. It also authorizes local school boards to adopt reasonable regulations for the use of school facilities.

   Section 414 states that school boards may permit the use of the schoolhouse or school grounds for, *inter alia*, the following purposes:

   (a) For the purpose of instruction in any branch of education, learning or the arts.
   \* \* \* \* \* \*
   (c) For holding social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community;

but such meetings, entertainment and uses shall be non-exclusive and shall be open to the general public.

   (d) For meetings, entertainments and occasions where admission fees are charged, when the proceeds thereof are to be expended for an educational or charitable purpose; but such use shall not be permitted if such meetings, entertainments and occasions are under the exclusive control, and the said proceeds are to be applied for the benefit of a society, association or organization of a religious sect or denomination....

event was "a little different than what was presented in the other concerts." *Id.* at 39.

**The Bruce Carroll Concert**

In April of 1995, Faith Fellowship used the Auditorium, with defendants' permission, to host and sponsor another music concert involving Christian artist and musician Bruce Carroll. During the concert, Carroll quoted and discussed the meaning of certain Bible passages, gave testimony and sang songs with religious themes. Grant Dep. at 57.

**The Mars Hill Concert**

On November 2, 1996, the Mars Hill Broadcasting Company, Inc. ("Mars Hill") used defendants' facilities at the Case Junior High School in Watertown, with defendants' permission, for a Gospel concert featuring performers Steve and Annie Chapman. *See* Pl.Rule 7.1(f) Stat. Ex. I. At the concert, the Chapmans sang songs featuring Bible verses and introduced songs by quoting from the Bible. *Id.* Ex. L at 36–37 (Deposition of Steve Chapman) (hereinafter "Chapman Dep."). Mars Hill charged an admission fee of $6 for the event and realized a gain of approximately $1,777.

**Plaintiffs' Requests**

On July 8, 1996, on behalf of Liberty, Nicholson, Savidge and Bryant requested permission to use the Watertown High School Cafeteria. The dates requested were August 3, 17, and 31, 1996; September 14 and 28, 1996; October 5 and 19, 1996; November 2, 16 and 30, 1996; and Dec. 14 and 28, 1996. Pl.Rule 7.1(f) Stat. Ex. Q ¶ 9 (Savage Affidavit). The stated purpose of the use was "worship service." Specifically, the worship services would include activities of prayer, music, religious services, religious instruction and Christian testimony. *Id.* ¶ 12. On July 16, 1996, the Board refused the request, citing Education Law § 414, and noting that the definition of permissible uses therein "does not include the use of public school buildings by religious organizations." Pl.Rule 7.1(f) Stat. Ex. R. The Board thus believed that it had no statutory authority

under section 414 to grant permission to any religious organization for the use of school facilities. *Id.*

On December 13, 1996, Pastor Bryant submitted to the Board a second request, on behalf of Liberty, for use of the Watertown High School Cafeteria. The stated purpose was "educational, family and Christian worship." The dates requested were Jan. 4, 5, 12, 19 and 26, 1997. Pl.Rule 7.1(f) Stat. Ex. P ¶¶ 9, 12 (Bryant Affidavit). On December 16, 1996, the Board refused the request, in a letter identical to that of the previous denial. Pl.Rule 7.1(f) Stat. Ex. S.

**B. Procedural History**

Plaintiffs filed their Complaint on April 28, 1997. The Complaint contains claims under 42 U.S.C. § 1983 for violations of: (1) plaintiffs' free speech rights under the First and Fourteenth Amendments; (2) plaintiffs' free association rights; (3) the First Amendment's Establishment Clause; (4) plaintiffs' free exercise rights under the First and Fourteenth Amendments; (5) plaintiffs' equal protection rights under the Fourteenth Amendment; (6) plaintiffs' due process rights under the Fourteenth Amendment; and (7) the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*[2] Plaintiffs seek injunctive and declaratory relief, damages and attorneys' fees.

Plaintiffs moved for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a), restraining and enjoining defendants from enforcing a ban on plaintiffs' First Amendment right to utilize the school facilities that have, by policy and practice, been made available for public use during non-school hours. This Court granted the motion in a bench decision rendered August 4, 1997. With respect to the question of whether plaintiffs met their burden to show sufficiently serious questions going to the merits to present a fair ground for litigation, this Court ruled that

section 414 and the policies of the Board promulgated thereunder evince an intent on the part of the State to "create a limited

---

**2.** RFRA has been declared unconstitutional by the United States Supreme Court. *See City of Boerne v. Flores,* —— U.S. ——, ——, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624 (1997). Accordingly, plaintiffs' RFRA claim is moot. *See Bronx Household of Faith v. Community Sch. Dist. No. 10,* 127 F.3d 207, 217 (2d Cir.1997).

public forum from which religious uses would be excluded."

August 4, 1997 Bench Decision (internal citations omitted). Nonetheless, the Court ruled,

> [t]here are indications in the record that the Board has allowed use of the Watertown High School Auditorium on prior occasions for functions involving content similar to that involved in plaintiffs' requested uses ... If the Board in fact allowed such uses in the past, it has opened the door to a genre of speech that it cannot now selectively close by denying plaintiffs' requests on the basis of their religious content.

*Id.* Plaintiffs now move for summary judgment on their free speech and equal protection claims. Defendants cross-move for summary judgment dismissing the Complaint.

## II. DISCUSSION

### A. Plaintiffs' Motion

#### 1. Standard for Summary Judgment

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party, *Heyman v. Commerce and Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975), and the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought. *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 585–86, 106 S.Ct. 1348. A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348).

It is with these considerations in mind that the Court addresses plaintiffs' motion for summary judgment.

#### 2. The Free Speech Claim

There is no dispute that the activities for which plaintiffs seek use of the cafeteria, namely religious speech and worship, constitute "forms of speech and association protected by the First Amendment." *Widmar v. Vincent,* 454 U.S. 263, 269, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *see Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 760–61, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). Such protection, however, does not entitle the speaker in every instance to unfettered access to public property. "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending upon the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Public property may be characterized for First Amendment purposes in three ways: (1) the traditional public forum; (2) the designated or "limited public forum;" and (3) the nonpublic forum. *Bronx Household of Faith v. Community Sch. Dist. No. 10,* 127 F.3d 207, 211 (2d Cir.1997) (citing *Cornelius v. NAACP Legal Defense & Educ. Fund Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)).

Venues like streets and parks constitute traditional public forums which have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Indus. Org.,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Content-based limitations on speech in such forums are subject to strict scrutiny analysis and will be upheld only where they are narrowly drawn to achieve a compelling state interest. *Capitol Square Review,* 515 U.S. at 761, 115 S.Ct. 2440; *International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); *Perry,* 460 U.S. at 45, 103 S.Ct. 948. The nonpublic forum, on the other hand, encompasses public property that is not by tradition or designation a forum for communication. *Perry,* 460 U.S. at 46, 103 S.Ct. 948. Such property is subject to time, place and manner restrictions, and may be reserved for its intended purposes so long as reasonable regulations on speech are not based upon public officials' opposition to the speaker's viewpoint. *Id.*

The third category is the designated or "limited" public forum. "Limited public forums are 'created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects.'" *Bronx Household,* 127 F.3d at 211 (quoting *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439). Where such a forum is generally open to the public, the First Amendment forbids the state to enforce content-based exclusions unless narrowly drawn to serve a compelling state interest, just as in the case of a traditional public forum. *Perry,* 460 U.S. at 45–46, 103 S.Ct. 948.

The State "is not required to indefinitely retain the open character" of a designated public forum, however, *Perry,* 460 U.S. at 46, 103 S.Ct. 948, and an entity such as a school district is entitled, as is a private owner of property, to "preserve the property under its control for the use to which it is dedicated." *Lamb's Chapel v. Center Mo-*

*riches Union Free Sch. Dist.,* 508 U.S. 384, 390, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). A state therefore may designate a forum as public "but limit[ ] the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Travis v. Owego–Apalachin Sch. Dist.,* 927 F.2d 688, 692 (2d Cir. 1991). Such content-based limitations are permissible to the extent that they preserve the purposes of the limited forum and are viewpoint neutral. *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829–30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Lamb's Chapel,* 508 U.S. at 393, 113 S.Ct. 2141; *see Bronx Household,* 127 F.3d at 211 ("restrictions on access based on speaker identity and subject matter are permissible only if 'the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'") (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439).

As to the specified uses for which such property is designated a public forum, the same First Amendment protections accorded traditional public forums apply. *Perry,* 460 U.S. at 46, 103 S.Ct. 948; *Calash v. City of Bridgeport,* 788 F.2d 80, 82 (2d Cir. 1986). In other words, constitutional protection in a limited public forum is afforded only to "expressive activity of a genre similar to those that government has admitted to the limited public forum." *Travis,* 927 F.2d at 692. The long and short of the limited public forum—the focus of this case—is that "the government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Id.*

### a. The Limited Public Forum

Plaintiffs argue that defendants' policies and practices have created a limited public forum open to a genre of speech that includes prayer, religious worship, religious music, religious instruction and Christian testimony. Plaintiffs further argue that because their requested uses fall within that genre, defendants' denials of those requests are unconstitutional.

We begin with the State and the School District's written policies. Defendants are bound by section 414 of the Education Law, which Policies No. 1500 and 1500–R incorporate by reference. According to the New York State Supreme Court, Appellate Division, Fourth Department, "[r]eligious purposes are not included in the enumerated purposes for which a school may be used under section 414" of the New York Education Law. *Trietley v. Board of Ed. of Buffalo,* 65 A.D.2d 1, 409 N.Y.S.2d 912, 915 (4th Dep't 1978). That construction of the statute is binding on this Court absent "persuasive data" that the New York Court of Appeals would rule otherwise. *Deeper Life Christian Fellowship Inc. v. Sobol,* 948 F.2d 79, 83–84 (2d Cir.1991) (addressing *Trietley* ) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Thus, nothing in the School District's "official" policies evinces the intent to designate school facilities as limited public forums for religious purposes.

This does not end the inquiry, however, because "the past practice of the School Board in regard to its use of the property at issue [also] is a proper consideration in" determining the type of forum created. *Deeper Life Christian Fellowship, Inc. v. Board of Educ. of the City of New York,* 852 F.2d 676, 680 (2d Cir.1988); *see Travis,* 927 F.2d at 693. *Travis* is instructive in this respect. In that case, the plaintiff, a "pro-life" pregnancy counseling organization, sought use of a school auditorium for a magic show by a Christian gospel evangelist. *Id.* at 690. The defendant school district denied the request citing section 414, *id.* at 691, despite having allowed the school to be used for a religious Christmas program on a prior occasion. *Id.* at 693. The plaintiff brought suit in this Court under 42 U.S.C. § 1983 alleging a First Amendment violation. This Court granted plaintiff's motion for summary judgment on the free speech claim. *Travis v. Owego–Apalachin Sch. Dist.,* 1990 WL 94196 (N.D.N.Y.).

In affirming the grant of summary judgment to the plaintiff on the free speech claim, the Second Circuit noted that

[plaintiff's] program was the same type as a previously permitted use. Even if the forum was limited, [plaintiff], being within the category for which use had been permitted, could not be denied access absent a sufficient constitutional justification. No such justification has been proffered. Though occasional prior use might not suffice to establish a designated public forum open to all, such use will result in a forum designated for the limited category exemplified by the prior use.

*Travis,* 927 F.2d at 693. We thus are faced with two questions: (1) whether plaintiffs' requested use is "similar" to a previous use; and (2) whether the School District can be said to have "permitted" the previous use.

**i. Are the uses similar?**

Plaintiffs want to use the cafeteria for "worship services," including prayer, music, religious services, religious instruction and Christian testimony. Have the school facilities been used for activities of the same genre? Plaintiffs claim they have, in the form of the gospel concerts that included elements of religious worship and instruction, prayer and Christian evangelism. Defendants counter that the gospel concerts are factually distinguishable, and thus of a different "genre," than religious services.

A religious worship service conceptually is of a different genre than a gospel concert. "Much of the world's greatest music has some religious connotation but can be enjoyed by people of all religious beliefs as well as people of no religious beliefs." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 959 F.2d 381, 388 (2d Cir.1992), *rev'd on other grounds,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). Moreover, the very fact that a certain expressive activity contains a "religious message" does not necessarily serve to create a limited public forum inclusive of *all* religious uses. *See, e.g., Travis,* 927 F.2d at 693 n. 3 (distinguishing charitable fund-raiser with religious message from actual practice of religion or religious services).

In the present case, however, the undisputed facts illustrate that plaintiffs' requested use is sufficiently similar to one of the prior

gospel concerts. "Local Talent Night" was advertised locally as a "Night of Christian Worship." Grant Dep. at 46. During "Local Talent Night," Grant said two or three prayers, and Bible passages were recited. Grant Dep. at 81–85. Individuals were invited to accept Jesus Christ as their "Lord and Saviour." *Id.* at 86. Grant specifically said a prayer noting that "[God] would get glory for what happened that night, and that [they] were there to honor him." *Id.* at 82. Grant also took 3–5 minutes at the end of the service to "share the gospel," during which he told those present that "Jesus proclaimed himself to be God's only son, and that he did come and he lived a perfect life." *Id.* at 86. There also was a "time of invitation" that evening, during which three or four individuals from the audience came forward and asked for prayer. *Id.* Those present sang "songs of worship," the lyrics of which were placed on overhead transparencies. *Id.* at 81, 83. Passages of scripture also were recited. *Id.* at 85. Faith Fellowship took up a collection at the event and raised between $150 and $200. *Id.* at 82. Fargo himself characterized the entire event as a "worship service." Fargo Dep. at 36.

Plaintiffs' requested use would include prayer, music, religious services, religious instruction and religious testimony. Savidge Aff. ¶ 12. Approximately one hour of plaintiffs' regular religious services consists of "praise and worship," during which the congregation sings together, guided by lyrics projected on an overhead transparency. Savidge Dep. at 15. The service also may or may not include some type of prayer, Savidge Dep. at 17, and also includes a sermon. *Id.* at 19–20. Individuals also may ask to be prayed for. *Id.* at 22–23.

Though plaintiffs' religious services and "Local Talent Night" are not identical events, that is not the standard. In a limited public forum, "constitutional protection is afforded only to expressive activity of a genre *similar* to those that the government has admitted to the limited forum." *Travis,* 927 F.2d at 692 (emphasis added). In *Travis,* the school district's allowance of the Christmas program consisting of twelve Christian hymns and a Bible reading opened the door for "an ordinary magic show followed by a short message promoting the Christian gospel." *Id.* at 693. Unlike, perhaps, a "traditional" gospel concert, the two comparative events at issue here took place in a religious context and had a religious purpose. *See, e.g., Lamb's Chapel,* 959 F.2d at 387 (gospel concert not religious where it "took place in a non-religious context and had a non-religious purpose"). The participants in the "Local Talent Night" were not present for entertainment purposes, but rather to, in Grant's terms, "honor God." Moreover, the context of "Local Talent Night" was explicitly religious, as are plaintiffs' religious services. "Local Talent Night" and plaintiffs' religious services each involve similar discrete elements as well, including "songs of worship," prayer, and recitations of scripture, and a certain degree of audience participation.

Judge Parker in the Southern District faced similar facts in *Trinity United Methodist Parish v. Board of Educ.,* 907 F.Supp. 707 (S.D.N.Y.1995). There, the defendant school district had allowed a gospel concert that opened with a prayer followed by ten gospel songs sung by two choirs. *Id.* at 712. The concert also featured a sermon and an altar call. *Id.* Judge Parker concluded that this expressive activity was sufficiently similar to the Christian magic show of Toby Travis (the "Christian illusionist" in *Travis* ), which featured a religious service, prayer, music, religious instruction and Christian testimony, such that Travis' request for use of school facilities could not be denied "absent a constitutionally sufficient justification." *Id.* at 715.[3]

---

**3.** The School District's reliance on *Bronx Household* is misplaced. The School District cites the case for the proposition that in a limited public forum, religious worship services, on the one hand, may be distinguished from discussion of religious material or material which contains a religious viewpoint, on the other. *See Bronx Household,* 127 F.3d at 215. In other words, the School District argues that it may constitutionally treat differently a gospel concert, which is no more than speech from a religious viewpoint, from religious worship services. This simply begs the question whether the gospel concerts in the present case were more than gospel concerts, and crossed the line into a genre sufficiently similar to that of plaintiffs' requested use. Un-

Based on these cases and the facts presented here, the Court concludes that plaintiffs' requested use is sufficiently similar to "Local Talent Night."

### ii. Did the School District "permit" the prior use?

The School District argues that even if plaintiffs' requested use is sufficiently similar to any of the prior concerts, the allowance of the prior uses was inadvertent at best and should not suffice to create a limited public forum inclusive of religious worship services. The School District seems to argue that it could not have "permitted" the prior uses in question because it had no knowledge of the actual nature of the gospel concerts. It relies in part on Faith Fellowship's application for permission, which indicated that the Auditorium would be used for "local talent," and specifically "Christian music." Finally, the School District argues it should not be charged with knowledge of the details of the prior concerts.

*Travis* squarely addressed and rejected these arguments. "Even if the School District genuinely misunderstood the nature of the [previous use] when viewing the application, it is now charged with the knowledge that the program was an openly religious affair." *Travis,* 927 F.2d at 693. That being said, there is little need to "charge" the School District with knowledge of the prior event, because Fargo admitted in his deposition that he had been alerted to the unique nature of "Local Talent Night" some two weeks after it occurred. Fargo Dep. at 39.

Defendants cite *Full Gospel Tabernacle v. Community Sch. Dist. 27,* 979 F.Supp. 214 (S.D.N.Y.1997) to support their argument that an inadvertent departure from a policy forbidding religious uses cannot serve to create a contrary policy. The case, however, is distinguishable on its facts from both the present action and *Travis.* Unlike the Watertown and Owego–Apalachin School Districts here and in *Travis,* the defendant school district in *Full Gospel* had an explicit policy prohibiting the use of school facilities

for religious worship services. *Full Gospel,* 979 F.Supp. at 222. While permission was nonetheless erroneously granted for worship services, that permission was revoked when school officials were made aware of the mistake. *Id.* In *Full Gospel,* the school district also took further remedial measures to ensure that such mistakes did not occur in the future, including reminding all school officials of the policy and of their duty to ensure adherence thereto. If violations occurred despite such precautions, a warning letter was to be sent to the violating organization. *Id.* at 222–23.

Defendants in the present case had no explicit policy forbidding the use of school facilities for religious worship services. Moreover, defendants present no evidence of having taken any remedial measures once made aware of the nature of the "Local Talent Night" event. Defendant Paul Simmons, the School Board President, specifically testified at his deposition that there has been no discussion of revising Policies No. 1500 and 1500–R. Such failures were fatal in *Travis:*

> [t]here is no evidence in the record that the School District, having learned that it had mistakenly permitted a religious program in violation of its policy, took steps to prevent a similar mistake in the future, and that such corrective measures caused the denial of [plaintiff's] application.

*Travis,* 927 F.2d at 693.

For all of the foregoing reasons, the Court concludes that defendants, having permitted a sufficiently similar use in the past, are precluded from denying plaintiffs' requested use absent sufficient constitutional justification. The School District offers no such justification. Accordingly, plaintiffs' motion for summary judgment on their section 1983 free speech claim is granted.

Plaintiffs therefore are entitled to the injunctive relief they seek enjoining defendants from denying plaintiffs' requested use of the cafeteria during non-school hours. As plaintiffs acknowledge, however, defen-

---

like the present case, *Bronx Household* discussed the distinction in the context of a case in which it was stipulated that the defendant school district

had never allowed its facilities to be used for any activities amounting to worship services. *See id.* at 211.

dants' current policy is to treat requests involving religious worship on an *ad hoc* basis. *See* Pl. Mem. In Support of Summary Judgment at 19–20; *Travis,* 927 F.2d at 694. Accordingly, the injunction will issue prohibiting denial of plaintiffs' access to the cafeteria "unless [defendants] expressly adopt[ ] a new policy that treats all programs [involving religious worship] equally." *Travis,* 927 F.2d at 694.

### 3. The Equal Protection Claim

 For similar reasons, plaintiffs are entitled to summary judgment on their equal protection claim.

"[U]nder the Equal Protection Clause, a governmental entity may not 'legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. . . . [A]ll persons similarly circumstanced shall be treated alike.'" *Trinity United Methodist Parish,* 907 F.Supp. at 719 (quoting *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (citations omitted)). The distinction the School Board has drawn in the present case is between two events involving substantially similar elements: prayer, worship, and religious music. Each also has (or had, in the case of Local Talent Night) a religious purpose and context. In light of these similarities, the School District's denial of access to one and allowance of the other cannot withstand review under either a strict scrutiny or rational basis standard. *Id.* Accordingly, plaintiffs' motion for summary judgment on its section 1983 claim alleging an equal protection violation is granted.

### B. Defendants' Motion

The undisputed facts in this case entitle plaintiffs to summary judgment on their free speech and equal protection claims. Accordingly, defendants' cross-motion as to these claims is denied as moot. Insofar as defendants' cross-motion seeks dismissal of plaintiffs' remaining claims, defendants fail to address those claims. Accordingly, the cross-motion is denied as to the remaining claims.

### III. CONCLUSION

For all of the foregoing reasons, plaintiffs' motion for summary judgment is **GRANTED.** Defendants' cross-motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**