**Joan DAILY, Plaintiff,**

v.

**NEW YORK CITY HOUSING AUTHORITY, Anthony Richburg, Reinaldo Pagan, and Louis Ortiz, Defendants.**

No. C.A. CV–02–1293(DGT).

United States District Court, E.D. New York.

Sept. 11, 2002.

Vincent P. McCarthy, New Milford, CT, for Plaintiff.

Gary Nester, New York City Housing Authority, Law Department, New York City, for Defendants.

### CORRECTED MEMORANDUM AND ORDER

TRAGER, District Judge:

Plaintiff Joan Daily brings this action against the New York City Housing Authority ("NYCHA") and three NYCHA employees, claiming that they violated her rights under the First and Fourteenth Amendments of the United States Constitution, Article I, Section 11 of the New York Constitution, and Section 40 of the New York Civil Rights Law by denying her application to use the community center at Woodside Houses, the public housing development at which Daily lives, to conduct "Bible studies" designed to comfort residents following the events of September 11, 2001. The complaint, filed on February 28, 2002, sought a preliminary injunction restraining the defendants from enforcing the NYCHA policy under which defendants denied Daily's application. An evidentiary hearing and oral argument was held on June 12, 2002.

## Background

### (1)

Plaintiff Daily is a resident of one of the approximately 1,500 apartments in the Woodside Houses, a public housing development located in Queens, New York that is owned and operated by NYCHA. Daily is the founder and pastor of the "I Must Be About My Father's Business Ministries, Inc." *See* Daily Letter of Oct. 13, 2001. The Woodside Community Center ("WCC") is a community center within the Woodside Houses that is also owned and operated by the NYCHA. *See* Declaration of Anthony Richburg ("Richburg Decl.") ¶¶ 1, 6. Following the events of September 11, 2001, Daily wrote to defendant Louis Ortiz, Director of the WCC, requesting permission to use the WCC "to conduct Bible studies" to "help, comfort, [and] encourage" local residents and "to let them know that all is not lost." Daily Letter of Oct. 13, 2001. "The purpose of this Bible Study was to study the Scriptures and to aid residents in dealing with their distress over the senseless terrorist killings of September 11." Plaintiff's Memorandum in Support of the Motion for Preliminary Injunction ("Pl.Mem.") at 2. Ortiz gave plaintiff's letter to his superior, defendant Reinaldo Pagan, an NYCHA Borough Administrator. *See* Declaration of Louis Ortiz ("Ortiz Decl.") ¶ 15. Citing NYCHA regulations that "prohibit the use of any NYCHA property for religious or political activities," Pagan denied Daily's request. *See* Pagan Letter of Oct. 15, 2001. Daily appealed this denial to defendant Anthony Richburg, Director of NYCHA's Queens Community Operations Office,[1] and Richburg upheld Pagan's decision. Pl. Mem. at 1. To date, Daily has been unable to use the WCC for her proposed sessions.

### (2)

NYCHA operates approximately 118 community centers throughout New York City. Richburg Decl. ¶ 6. According to NYCHA guidelines issued to community center directors, the goal of these community centers "is to offer public housing residents, specifically children and youth, a variety of educational, recreational, social, and cultural activities and programs." Richburg Decl. Ex. A at 1.

The WCC is used for a variety of activities. These activities fall into two categories: regularly scheduled educational and after-school uses, and temporary uses. The WCC has three primary regularly scheduled uses. First, General Equivalency Diploma classes are taught during the day, as is a ceramics class geared toward senior citizens. *See* Ortiz Decl. ¶ 9 & Ex. A (WCC schedule for Dec. 2001–Mar. 2002). Transcript of June 12, 2002 Hearing ("Tr.") at 41. Second, an after-school program for six-to-twelve year olds operates during the school year from 2:30 p.m. to 6:30 p.m. *See id.* ¶ 5. In accordance with NYCHA guidelines and standards, this program includes homework assistance, reading skills development, snacks and dinner, and activities such as arts and crafts, indoor and outdoor games, computers, movies, and story telling. *See id.* & Ex. A. During the summer, this program is replaced by a similar day-camp program. *See id.* ¶ 5.

Third, a program for teenagers operates between 7:00 p.m. and 9:45 p.m. *See* Ortiz Decl. ¶ 6. Classes in dance, computers, sewing, and ceramics are offered, as are activities such as arts and crafts, weight lifting, Girl Scouts, and study hall. *See id.* & Ex. A. Adults may join in these classes. *See id.* ¶ 9; Richburg Decl. ¶ 8.

---

1. The Queens Community Operations Office manages NYCHA's ten community centers in Queens, including the WCC. Richburg Decl. ¶ 1.

As part of the after-school program, there are also six weeks of workshops for children between nine and eighteen on topics such as leadership and communication skills, conflict resolution, decision-making, drug abuse prevention, cultural diversity, and responsibility. *See* Ortiz Decl. ¶ 8 & Ex. B. NYCHA, in collaboration with the Office of the Mayor and the New York City Police Department, sponsors these workshops, called the ASPIRE program.[2] *See id.* This program is limited to teenagers. Tr. at 10.

Beside these uses, the WCC may be used temporarily by several groups. The regulation to which Pagan referred in his letter to Daily, NYCHA Standard Procedure 088:80:1 ("Standard Procedure"), governs the procedure for the temporary use of NYCHA-managed community centers. Pl. Mem. Ex. A. Section III.A. of the Standard Procedure lists three approved temporary uses of NYCHA-managed community centers. First, "[a] recognized Tenant Association (including its committees and affiliates) may have use of the community center rent free, as space is available. This includes use of the community center for meetings, fund-raising affairs, and other events." *Id.* Neither party discusses what a recognized tenant association is, but apparently it is the "duly elected resident council" that a housing authority must recognize as "the sole representative of the residents it purports to represent" under federal regulations governing the Department of Housing and Urban Development. *See* 24 C.F.R. § 964.18(a)(1). The regulations also state that, if requested, a housing authority should provide a resident council office space and meeting facilities free of charge. *See* 24 C.F.R. § 964.18(a)(7).

It is not entirely clear whether the WCC has been used in the past by the tenant association. According to Richburg, NYCHA Deputy General Counsel Henry Schoenfeld, and NYCHA Assistant General Counsel Gary Nester, the community centers generally are used for monthly tenant association meetings to discuss housing, maintenance, and related issues. Tr. at 2–3, 41. Richburg and Nester acknowledged that the regulations permit the tenant association to use a community center to raise funds for its activities, but did not indicate whether any such events had been held at the WCC. Tr. at 3, 4–5. Richburg also acknowledged that "occasionally [a tenant association] might have someone come in and speak to the residents about housing issues or issues that are for the community." Tr. at 4. The broad expression—"issues that are for the community"—went unexplained.

Second, section III.A. of the NYCHA Standard Procedure states that "[o]ther tenant groups may use common spaces within the community centers free of charge for RPL 230 meetings." Pl. Mem. Ex. A. An "RPL 230" meeting is a meeting of a group organized under New York Real Property Law § 230. Under § 230(1), landlords may not "interfere with right of a tenant to form, join, or participate in the lawful activities of any group, committee, or other organization formed to protect the right of tenants." N.Y. Real Prop. Law § 230(1) (McKinney's 2001). In addition, "[t]enants' groups, committees or other tenants' organizations" have the right "to meet without being required to pay a fee in any location on the premises including a community or social room where use normally subject to a fee which is devoted to the common use of all tenants

**2.** ASPIRE is an abbreviation for "After School Program for Interaction, Recreation and Education." *See* Ortiz Decl. Ex. B.

in a peaceful manner, at reasonable hours and without obstructing access to the premises or the facilities." N.Y. Real Prop. Law § 230(2) (McKinney's 2001).

Richburg stated that he did not know of any other tenant groups using the WCC. Tr. at 7. In addition, as the regulations discuss using the WCC for "RPL 230 meetings," it seems that only a tenant organization "formed to protect the rights of tenants" could use it under this regulation.

Finally, section III.A. allows community centers to be "rented for family events and celebrations such as weddings, birthdays, graduations, and anniversaries in accordance with this procedure." Pl. Mem. Ex. A. According to the schedules, the WCC was rented for three Saturdays in March, 2002, but no further detail was provided about the events that took place. *See* Ortiz Decl. Ex. A.

Section III.B. lists several activities that are prohibited at all NYCHA-managed community centers:

- Sale or consumption of alcoholic beverages.
- Any form of gambling.
- Any other form of illegal activity.
- Any partisan activity.
- Any sale of tickets for events, including performances, raffles or dances, unless prior Authority approval has been granted.
- Religious services, unless the religious services are directly connected to the principal reason for a family-oriented event, such as weddings.
- Any commercial enterprise.

Pl. Mem. Ex. A.

In addition to the these explicitly-sanctioned uses of community centers, defendants acknowledge that NYCHA community centers have been used by adults as an informal space to socialize. *See* Richburg Decl. ¶ 9.

Defendants also stated during the evidentiary hearing that they would allow certain other uses of the WCC, even though it had not been used for those purposes in the past. As stipulated in the Standard Procedure, Nester stated that a wedding involving a tenant that included any type of religious ceremony would be permitted in the WCC.[3] Tr. at 13, 18, 42–43. Similarly, defendants would allow a confirmation or a baby shower. Tr. at 18, 41. Defendants also said they might allow a memorial service for a resident who died as a result of September 11. Tr. at 7–8. In addition, although the Standard Procedure does not appear to provide for temporary uses other than the three listed, defendants acknowledged that they would permit residents to use the WCC for a book club or a Shakespeare club. Tr. at 9, 17, 25–26.

Finally, according to Richburg, NYCHA would allow a group of tenants to informally discuss their feelings about the events of September 11. Tr. at 36. However, Richburg added that if they wanted to look to the Bible or other religious texts for comfort, he would refer the request to the NYCHA Law Department. Tr. at 36. Asked if the Law Department would approve such a request, Nester stated: "Residents congregate at the community center and carry on discussions without asking us our permission. They are free to come in and sit down and chat about any subject." Tr. at 36–37. Schoenberg added that "[t]here is nothing to prevent our tenants from talking among themselves." Tr. at 37.

The record is less clear as to whether NYCHA would allow a group of tenants to hold formal "grief counseling" sessions in

---

3. Nester described this a *de minimis* exception to the rule. Tr. at 13.

the WCC. Richburg first said that if a single resident or group of tenants requested some kind of counseling service to deal with these issues, he would refer them to NYCHA's Social Services Department. Schoenfeld stated that grief counseling similar to that planned by Daily, but with only secular content, would be "comparable" to Daily's, and presumably would be denied. Tr. at 37–38. However, when asked if NYCHA would approve a formal program to address emotional issues created by September 11 using only secular works such as those of Freud and Jung, Nester replied that NYHCA "would take it under advisement." Tr. at 38.

Finally, defendants stated that NYCHA had never approved any requests to use the WCC for any "grief counseling," religious or otherwise. Tr. at 40–41.

### Discussion

A party seeking a preliminary injunction normally must demonstrate:

> (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) seriously sufficient questions going to the merits of a case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor.

*Forest City Daly Housing, Inc. v. Town of N. Hempstead,* 175 F.3d 144, 149 (2d Cir. 1999). "An even more rigorous standard—requiring a 'clear' or 'substantial' showing of likelihood of success—applies where '(i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *See id.* at 149–50 (quoting *Tom Doherty Assocs. v. Saban Ent., Inc.,* 60 F.3d 27, 33–34 (2d

Cir.1995)); *see also Brewer v. West Irondequoit Cent. Sch. Dist.,* 212 F.3d 738, 743–44 (2d Cir.2000).[4]

### (1)

### Irreparable Harm

■ Defendants first argue that Daily has not shown that she will suffer irreparable harm if the preliminary injunction is not granted. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). The Second Circuit acknowledges that it "has not spoken with a single voice on the issue of whether irreparable harm may be presumed with respect to complaints alleging the abridgment of First Amendment rights." *Amandola v. Town of Babylon,* 251 F.3d 339, 343 (2d Cir.2001). In certain cases, it has presumed irreparable harm, *see Tunick v. Safir,* 209 F.3d 67, 70 (2d Cir.2000); *Bery v. City of New York,* 97 F.3d 689, 693 (2d Cir.1996), while in others it has required a showing of irreparable harm by establishing an actual chilling effect, *see Latino Officers Ass'n v. Safir,* 170 F.3d 167, 171 (2d Cir.1999). Here, it is not necessary to address this tension because it is clear there was an actual chilling effect-Daily was, and still is, unable to conduct her proposed sessions at the WCC.

■ Defendants argue that Daily's failure to promptly seek a preliminary injunction calls into question her claim of irreparable injury. Specifically, defendants allege that Daily waited for more than four months after her request for permission to use the WCC was denied before seeking a preliminary injunction. It is true that a delay in seeking a preliminary

---

4. Although Daily only seeks a preliminary injunction, this action is not a great deal more than a request for a declaratory judgment.

Nevertheless, the standards for a preliminary injunction will be applied.

injunction "tends to indicate at least a reduced need for such drastic, speedy action," *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985), and that the "[l]ack of diligence, standing alone, may ... preclude the granting of preliminary injunctive relief." *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir. 1985); *see also Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir.1995). Here, however, Daily was sufficiently diligent to support a claim of irreparable injury. Rather than the four month delay alleged by defendants, Daily claims that negotiations between the parties broke down in December 2001, and that she therefore only waited two to three months before filing at the end of February 2002. Moreover, any delay by Daily does not undermine the fact that she still cannot use the WCC for her proposed sessions. Accordingly, Daily suffered irreparable harm when defendants denied her application to use the WCC.

### (2)

### Forum Analysis

Defendants also argue that Daily cannot demonstrate a clear or substantial likelihood of success on the merits.[5] The evaluation of Daily's likelihood of success must begin with an analysis of the type of forum for speech at the WCC.

The First Amendment does not guarantee unlimited access to all government property for expressive purposes. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ.*

*Fund*, 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985); *see also Travis v. Owego–Apalachin Sch. Dist.*, 927 F.2d 688, 691 (2d Cir.1991). Rather, the freedom to speak on government property depends on the nature of the forum where the speech is delivered. *See United States v. Kokinda*, 497 U.S. 720, 726, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990) (quoting *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448); *see also Bronx Household of Faith v. Community Sch. Dist. No. 10*, 127 F.3d 207, 211 (2d Cir.1997), *overruled on other grounds, Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106, 121 S.Ct. 2093, 2099, 150 L.Ed.2d 151 (2001).

The Supreme Court has identified three categories of government property, and given standards for reviewing restrictions on speech in each type of forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983); *see also New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128 (2d Cir. 1998). The first category, a traditional public forum, is a place that "by long tradition or by government fiat ha[s] been devoted to assembly and debate," and in which "the rights of the state to limit expressive activity are sharply circumscribed." *Perry*, 460 U.S. at 45, 103 S.Ct. at 954; *see also New York Magazine*, 136 F.3d at 128. For example, public streets and parks are traditional public fora. *See Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939); *see also Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55; *Travis*, 927 F.2d at 692. The Supreme Court has also identified the "meeting hall" as a traditional public forum. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41

---

5. Daily does not argue that there are seriously sufficient questions going to the merits of a case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in her favor.

L.Ed.2d 770 (1974) (holding that advertising space on the side of a public bus is unlike open spaces, meeting halls, parks, street corners, and other public thoroughfares). The government may not prohibit all expressive activity in a traditional public forum, and content-based restrictions on speech are valid only if they are necessary to serve a compelling state interest and are narrowly drawn to achieve that end. *See Perry,* 460 U.S. at 45, 103 S.Ct. at 955; *see also Travis,* 927 F.2d at 692. "The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry,* 460 U.S. at 45, 103 S.Ct. at 955; *see also Travis,* 927 F.2d at 692.

The second category of government property, the nonpublic forum, is not open by tradition or designation to the public for expressive activity. *See Perry,* 460 U.S. at 46, 103 S.Ct. at 955; *see also Travis* 927 F.2d at 692. "Control over access to a nonpublic forum can be based on subject matter and speaker identity as long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451; *see also Kokinda,* 497 U.S. at 730, 110 S.Ct. at 3121–22; *New York Magazine,* 136 F.3d at 128. The Supreme Court has placed many types of government "property" in this category, including: the open areas of a military base, *see Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); household mail boxes, *see United States Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981); a public school's internal mail system, *see Perry,* 460 U.S. at 48, 103 S.Ct. at 957; the federal government's annual charity drive, *see Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451; a public high school newspaper, *see Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 269–70, 108 S.Ct. 562, 569, 98 L.Ed.2d 592 (1988); sidewalk areas around a post office, *see Kokinda,* 497 U.S. at 730, 110 S.Ct. at 3121–22; airport terminals, *see International Soc. for Krishna Consciousness v. Lee,* 505 U.S. 672, 112 S.Ct. at 2701, 120 L.Ed.2d 541 (1992); and a televised debate between candidates for political office, *see Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 680, 118 S.Ct. 1633, 1643, 140 L.Ed.2d 875 (1998).

The third category is the designated public forum, which "consists of public property which the state has opened for use by the public as a place for expressive activity." *Perry,* 460 U.S. at 45, 103 S.Ct. at 955. The government is not required to open the forum in the first place, or keep it open indefinitely, but as long as it maintains the designated public forum, it is bound by the same standards as it is for a traditional public forum. *See Perry,* 460 U.S. at 45–46, 103 S.Ct. at 955; *see also Travis,* 927 F.2d at 692. A designated public forum can only be created by "purposeful government action" in which "the government must intend to make the property 'generally available.'" *Forbes,* 523 U.S. at 677–78, 118 S.Ct. at 1641–42 (quoting *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449). In other words, the government must have, "by policy or practice," opened its facilities "for indiscriminate use by the general public." *Perry,* 460 U.S. at 46–47, 103 S.Ct. at 955–56; *see also Hazelwood Sch. Dist.,* 484 U.S. at 267, 108 S.Ct. at 568 (1988). Moreover, "[t]he government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449; *see also Forbes,* 523 U.S. at 677, 118 S.Ct. at 1641; *New York Magazine,* 136 F.3d at 129. The Supreme Court has placed several types of government

property in this category, including: university meeting facilities generally open for use by student groups, *see Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); a school board meeting open to the public, *see Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976); and a municipal auditorium and city-leased theater designed for and dedicated to expressive activities, *see Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). *See also Perry,* 460 U.S. at 45–46, 103 S.Ct. at 955.

Somewhat confusingly, the Supreme Court and lower courts also recognize another category, the limited public forum. *See Perry,* 460 U.S. at 45–46 n. 7, 103 S.Ct. at 948 n. 7; *Cornelius,* 473 U.S. at 799–802, 105 S.Ct. at 3439; *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 2516–17, 132 L.Ed.2d 700 (1995); *Good News Club,* 533 U.S. at 106, 121 S.Ct. at 2100; *Fighting Finest v. Bratton,* 95 F.3d 224, 229 (2d Cir.1996); *Travis,* 927 F.2d at 692. The confusion stems from the "somewhat mixed signals" the Supreme Court has sent "as to the criteria for identifying a 'limited' public forum." *Fighting Finest,* 95 F.3d at 229. Thus, the Second Circuit has usually described the limited public forum as a sub-category of the designated public forum, *see Travis,* 927 F.2d at 692; *New York Magazine,* 136 F.3d at 128 n. 2, but recognizes they are subject to the same standard as applies to the nonpublic forum, *see Bronx Household of Faith,* 127 F.3d at 211–12 ("[R]estrictions on access based on speaker identity and subject matter are permissible only if 'the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.' ") (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451); *see also New York Magazine,* 136 F.3d at 128 n. 2 ("Exclusions of speech under this category

are treated the same as exclusions under non-public fora."). Moreover, in the Supreme Court's most recent analysis of a restriction in a limited public forum, it repeated that such restrictions "must not discriminate against speech on the basis of viewpoint," and "must be reasonable in light of the purpose served by the forum." *Good News Club,* 533 U.S. at 106–07, 121 S.Ct. at 2100 (quotation and citations omitted). Other circuits agree with the application of this standard. *See Gentala v. Tucson,* 213 F.3d 1055, 1062 n. 4 (9th Cir.2000) ("[T]he distinction between a limited public forum and a nonpublic forum is a semantic distinction without an analytic difference."); *Warren v. Fairfax County,* 196 F.3d 186, 194 n. 8 (4th Cir.1999) (en banc) (same). Accordingly, some courts have taken to describing the limited public forum as a variety of the nonpublic forum. *See People for the Ethical Treatment of Animals v. Giuliani,* 105 F.Supp.2d 294, 310 (S.D.N.Y.2000).

More specifically, the Supreme Court stated in *Good News Club* that "[w]hen the State established a limited public forum, the State is not required to and does not allow persons to engage in every type of speech. The State may be justified 'in reserving [its forum] for certain groups or for the discussion of certain topics.' " *Good News Club,* 533 U.S. at 106, 121 S.Ct. at 2100 (quoting *Rosenberger,* 515 U.S. at 829, 115 S.Ct. at 2516–17); *see also Travis,* 927 F.2d at 692 (a limited public forum is created "when government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects"). Two types of government property are clearly in this category: public school facilities during after-school hours, *see Good News Club,* 533 U.S. at 106, 121 S.Ct. at 2100; *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 392–93, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993),

and the student activities fund of a public university, *see Rosenberger*, 515 U.S. at 829–30, 115 S.Ct. at 2516–17. In addition, many designated public fora are restricted in some way, so they also appear to fall into the limited public forum category. For example, in *Perry*, the Supreme Court noted that the university meeting facilities in *Widmar* were limited to use by student groups, and the school board meeting in *Madison Joint School District* was limited to discussions of school board business. *See Perry*, 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7; *see also Santa Fe Ind. Sch. Dist. v. Doe*, 530 U.S. 290, 303 n. 12, 120 S.Ct. 2266, 2275 n. 12, 147 L.Ed.2d 295 (2000) (describing *Widmar* as a limited public forum case).

■ Thus, if the WCC is a designated public forum, any restrictions will be subjected to strict scrutiny, but these restrictions will only need to be viewpoint neutral and reasonable in the light of the WCC's purpose if it is a limited public forum or a nonpublic forum.[6] Plaintiff argues at one point that the WCC is a designated public forum because it is "open to all manner of uses." Pl. Mem. at 4. Defendants contend that the WCC cannot be a designated public forum because it has not, in fact, been opened to "indiscriminate" use by the public. *See* Defendant's Memorandum of Law ("Def.Mem.") at 11. Rather, defendants argue that the WCC is a limited public forum. *See id.* Plaintiff later appears to concede this point. Plaintiff's Response ("Pl.Resp.") at 4.

Of the only two cases found that address community centers in public housing, one concluded that the center in question was a nonpublic forum, and the other that it was limited public forum. One case in the Southern District of New York also involved an NYCHA community center and a policy similar to the Standard Procedure. *See Concerned Residents of Taylor–Wythe v. New York City Housing Auth.*, 1996 WL 452432 (S.D.N.Y. Aug. 9, 1996). The court in *Concerned Residents* held that "in the light of NYCHA's clear policy allowing access to the Center cannot be said to have been opened to 'indiscriminate use' by the public," and thus is not a limited public forum but a nonpublic forum. *Id.* at *5. Accordingly, the restrictions only needed to be viewpoint neutral and reasonable in the light of the community center's intended purpose. *See id.* However, in *Crowder v. Housing Auth. of the City of Atlanta*, 990 F.2d 586 (11th Cir.1993), the court, observing that "[m]anagement opened the auditorium [in the plaintiff's building] to a wide range of expressive activities, including ceramics classes, political speeches, and religious services," held that the defendants had created a limited public forum. *Id.* at 591. Neither case is binding, and both require the application of the same standard—that restrictions on expression are valid if they are reasonable in light of the purpose served by the forum and are viewpoint neutral.

As the WCC is used for a variety of activities, it could be a different kind of forum at different times. This is similar to the public schools in *Good News Club* and *Lamb's Chapel*, presumably nonpublic fora during school hours, but which the Supreme Court held to be limited public fora during after-school hours. Likewise, the

---

**6.** Although the WCC is not a place that by long tradition has been devoted to assembly and debate, there are some apparent similarities between the WCC and the "meeting hall" mentioned in *Lehman*. However, neither *Lehman* nor the Supreme Court or lower courts have explained what is encompassed by the term "meeting hall." Moreover, it would appear that any sort of meeting hall would fit better into the designated public forum category, as it would likely be a place that the state opened for use by the public as a place for expressive activity.

WCC appears to be a nonpublic forum during the hours in which it has regularly scheduled educational activities. Clearly, during the GED and ceramics classes for adults, and during the after school and summer camp programs for six-to-twelve year olds, the WCC has not been designated for expressive activity and is thus a nonpublic forum. The situation is not quite as clear-cut during the evening program for teenagers, when most of the activities are educational classes and activities. However, the WCC also hosts Girl Scout meetings during the evening programs. By doing so, NYCHA may have created a limited public forum during this period. *See Perry,* 460 U.S. at 48, 103 S.Ct. at 956 (assuming without deciding that granting access to the public school's internal mail system to the Cub Scouts, YMCAs, and parochial schools created a limited public forum).

The situation is quite different at other times. Based on *Concerned Residents* and *Crowder,* it would appear that NYCHA has created a limited public forum at the WCC. Under the Standard Procedure, the only expressive activities permitted in the WCC are tenant association activities, RPL § 230 meetings, and family celebrations. The WCC is also used informally for socializing by tenants, and could be used for book clubs and for informal gatherings of tenants to discuss their feelings about the events of September 11.

In addition, the nature of a community center of a public housing complex when it is not being used for regularly scheduled educational activities is different from other identified types of limited public fora. These centers were built for the benefit of the residents, to provide a place where children, youth, *and adults* could be enriched by "a variety of educational, recreational, social, and cultural activities and programs." Richburg Decl. Ex. A at 1. Public schools and their facilities, on the other hand, are built primarily to serve the educational needs of the attending students, and the after-school use by outside groups, as in *Good News Club* and *Lamb's Chapel,* represents a secondary purpose. For example, a community center can serve as a meeting place for residents of a housing development where they could discuss any subject. This view is bolstered by defendants' acknowledgment that residents are free to use the WCC informally to discuss any topic, including their emotional responses to September 11. It defies the broad purpose of these community centers to designate them as places in which the government may severely regulate the speech of the residents supposedly served by them.

Accordingly, it would not be implausible to consider the WCC a designated public forum at times other than during the regularly scheduled educational activities. However, the narrow definition of a designated public forum put forth by the Supreme Court—that to create this type of forum the government must by policy or practice intentionally open its facilities for indiscriminate use—constrains the analysis in this case. Under the Standard Procedure, NYCHA has not opened the WCC for indiscriminate use. Rather, it has limited its use to some degree, both during the time when regularly scheduled educational activities occur and at other times. That NYCHA also allows tenants to informally gather and express themselves at the community centers is not enough to transform them into designated public fora because it has not intentionally opened them for indiscriminate discourse. Therefore, NYCHA has created a nonpublic forum at times and a limited public forum at other times, and the restrictions that were used to deny Daily access to the WCC must be examined to determine whether they were viewpoint neutral and reason-

able in light of the purpose served by the WCC.

### (3)

### Viewpoint Discrimination

■ Restrictions on expression in a limited public forum or a nonpublic forum are only valid if they are reasonable in light of the purpose served by the forum and are viewpoint neutral. Plaintiff argues that NYCHA's restrictions are not viewpoint neutral because it allows the WCC to be used for many types of community instruction and recreational activities for the personal enrichment of both adults and children, and because it permits religious elements of family events such as weddings. Pl. Reply Mem. at 4–5, 8. Defendants contend that the Standard Procedure, both on its face and as applied, is viewpoint neutral because NYCHA has not in the past permitted the WCC to be used for any secular or religious activities similar to those Daily wants to conduct. Def. Mem. at 14.

The Standard Procedure, on its face, appears to discriminate both against religion and among different religious uses. First, it permits the WCC to be used for several purposes, but specifically excludes "religious services." Pl. Mem. Ex. A. In the abstract, permitting secular uses but not religious ones is discriminatory. Then, the Standard Procedure carves out an exception to this exclusion, and grants permission for the WCC to be used for religious services "directly connected to the principal reason for a family-oriented event." *Id.* This appears to differentiate among various religious uses, also a form of discrimination. These problems with the Standard Procedure on its face suggest that it may well require revision.

Defendants' argument that Standard Procedure, both on its face and as applied, is viewpoint neutral because in the past it has not permitted the WCC to be used for any activities similar to Daily's Bible study/grief counseling sessions is based on *Travis,* in which the Second Circuit held that in a limited public forum:

> [C]onstitutional protection is afforded only to expressive activity of a genre similar to those that government has admitted to the limited forum. Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre.

*Travis,* 927 F.2d at 692; *see also Perry,* 460 U.S. at 48, 103 S.Ct. at 956 (in a limited public forum, the constitutional right of access only extends "to other entities of similar character"). As noted above, defendants assert that NYCHA has not in the past admitted activities of a genre similar to that which Daily wants to conduct, and Daily asserts that it has. However, despite the language of *Travis,* what genre of activities NYCHA has permitted in the past to be conducted at the WCC is not the only relevant question. Rather, it is also necessary to consider what activities NYCHA would allow under its procedures, even if it has not been asked to do so in the past.

■ In determining whether there has been viewpoint discrimination, courts usually only consider those activities which the government previously permitted to be held in the forum.[7] *See id.; see also Bronx Household of Faith,* 127 F.3d at 214–15; *Saratoga Bible Training Inst. v. Schuylerville Cent. Sch. Dist.,* 18

---

7. None of these courts addressed whether they could consider what activities would have been allowed if someone had asked.

F.Supp.2d 178, 184–85 (N.D.N.Y.1998); *Liberty Christian Cent., Inc. v. Board of Ed. of the City of Sch. Dist. of the City of Watertown,* 8 F.Supp.2d 176, 184–85 (N.D.N.Y.1998); *Full Gospel Tabernacle v. Community Sch. Dist. 27,* 979 F.Supp. 214, 221 (S.D.N.Y.1997). However, in *Good News Club,* the Supreme Court indicated, albeit *sub silentio,* that courts could consider what activities the government hypothetically would permit to be conducted, even if those activities had never been conducted in the forum in the past. *Good News Club,* 533 U.S. at 103, 108, 121 S.Ct. at 2098, 2101.

In *Good News Club,* the Court considered whether a New York State school district had engaged in viewpoint discrimination when it refused to allow a private Christian organization for children to hold weekly after-school meetings in the limited public forum of a school cafeteria. *Id.* at 106, 121 S.Ct. at 2100. The Court did not limit its inquiry to those groups that the school district previously had permitted to use the building. Rather, it considered both prior uses of the school and those that the school's superintendent said would be allowed if a group had requested access. Specifically, the Court observed that the school district's policy "would allow someone to use Aesop's Fables to teach children moral values," that "a group could sponsor a debate on whether there should be a constitutional amendment to permit prayer in public schools," and that "the Boy Scouts could meet to influence a boy's character, development and spiritual growth." *Id.* at 108, 121 S.Ct. at 2101. The opinion itself does not indicate whether or not these activities had been permitted by the school district in the past. But the source of the Court's information was the deposition of the superintendent, in which he stated that he would have granted hypothetical requests of groups that wanted to use Aesop's Fables to teach moral values and to hold a debate on a constitutional amendment to permit prayer in school.[8] Only the Boy Scouts, however, actually had been permitted to use the school building in the past.

Looking at both actual prior uses and confirmed hypothetical uses of a particular government property best represents the scope of a limited public forum because consideration of only actual prior uses in some cases will be an under-inclusive measure of the full range of types of allowed uses. In some situations, broadly written regulations will no doubt on occasion deter parties from requesting the use of the forum for a permitted use. Until someone makes the effort to challenge such regulations, actual prior uses are likely to limit the scope of the forum. In other situations, no one may have yet requested to use the forum for a particular purpose, but the use would be permitted. This could be the case for newly-issued regulations. Accordingly, it is proper to take into account both actual prior uses and confirmed hypothetical uses.

■ With this in mind, the question of whether the WCC is open to expressive activity of a genre similar to Daily's Bible study/grief counseling sessions can be examined. The WCC is used for a wide variety of activities. Some of these can be excluded from consideration because-unlike Daily's proposed use-they are designed exclusively for children and teenagers. Accordingly, the after-school and summer day-camp programs for six-to-twelve year olds, and the ASPIRE program (which is limited to nine-to-eighteen year olds) are not relevant. However,

---

8. The deposition of the superintendent is Exhibit N of the Application to Petition for Certiorari in *Good News Club.* The Court refers to pages N6 and N10–11. The document is on file at the Supreme Court and has been docketed in this case.

most other uses of the WCC are relevant, including: the GED and ceramics classes for adults; meetings and other events actually held or that could have been held by the tenant association; RPL 230 meetings; family events and celebrations (including those with a "directly connected" religious service); book club meetings; informal social gatherings; and, informal discussions among tenants about their feelings about the events of September 11.

The key issue is the determination of the breadth of the genre Daily's proposed use. Defendants contend that the genre is limited to formal grief counseling, and that as NYCHA has never allowed the WCC to be used for any type of formal grief counseling in the past, denying Daily's request is not viewpoint discrimination. Plaintiff contends that she proposes to use the WCC for community instruction with the goal of personal enrichment, and argues that as NYCHA allows many forms of community instruction, denying her request is viewpoint discrimination.

Courts appear to define the scope of the genre in question somewhere between the positions taken by the parties here. For example, in *Good News Club*, the Supreme Court in effect defined the relevant genre as groups that taught or promoted moral and character development to children. *See Good News Club*, 533 U.S. at 108–11, 121 S.Ct. at 2101–02. Accordingly, as the school district acknowledged it would allow other groups that taught or promoted to children moral and character development to use the school building, barring the Christian organization from using it was viewpoint discrimination. *See id.; see also Lamb's Chapel*, 508 U.S. at 393, 113 S.Ct. at 2147 (viewpoint discrimination when a school district allowed "a lecture or film about child rearing and family values" from a secular perspective but not from a religious one); *Perry*, 460 U.S. at 48, 103 S.Ct. at 956 (opening up the public school's

internal mail system to the Cub Scouts, YMCAs, and parochial schools would open it up to use by "other entities of similar character" such as the Girl Scouts, local boys' club, and "other organizations that engage in activities of interest and educational revelance to students"). Defendants' proposed genre of formal grief counseling is too narrow—at the very least, Daily's planned activity is in the same genre as an informal discussion among tenants about emotional issues stemming from September 11. More likely, Daily's proposed Bible study sessions fall into a broader genre of activities designed to provide general emotional and psychological support to tenants. Indeed, it is not implausible that the genre could be as broad as community instruction with the goal of personal enrichment.

In any case, it is not necessary to precisely define the scope of activities within the genre of Daily's proposal because defendants acknowledge that they would permit informal discussions among tenants about their feelings about the events of September 11. This alone demonstrates that defendants engaged in viewpoint discrimination in denying Daily's request. If other tenants would be allowed to use the WCC to discuss their feelings about the events of September 11 from any perspective, it must be discriminatory to bar Daily from doing so from an explicitly religious point of view. Nor is defendants' apparent distinction between informal discussions among tenants and Daily's formal sessions convincing. Whether the use is more or less organized is not relevant to whether the use was or would have been permitted.

Furthermore, the Standard Procedure specifically states that the tenant association "may have use of the community center rent free, as space is available." From this it appears that the tenant association could decide to hold grief counseling ses-

sions—from any perspective—in the WCC. Accordingly, it is discriminatory to prevent Daily from holding such sessions simply because it calls for a religious viewpoint.[9]

In addition, by allowing some religious activity at the WCC in the form of services associated with family events and celebrations, defendants cannot exclude Daily's proposed religion-based activity. Defendants claim that Daily's proposal was denied because her sessions would have been a religious service barred by the Standard Procedure. Plaintiff contends that the sessions were not religious services, and thus not covered by the Standard Procedure's prohibition. Even if Daily's proposed activities were religious services, the regulations do allow others to hold religious services at the WCC. Defendants merely argue that the permitted services are a *de minimis* exception to the general rule. However, any exception to the rule, even a small one, opens the WCC up for other similar activity. Accordingly, defendants' decision to deny Daily's request to hold Bible study/grief counseling sessions at the WCC constitutes viewpoint discrimination.

### (4)

### Reasonable In Light Of The Forum's Purpose

█ In addition to being viewpoint neutral, restrictions on expression in a limited public forum must also be "reasonable in the light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451; *see also Rosenberger*, 515 U.S. at 829, 115 S.Ct. at 2517. The government's decision to restrict access "need only be *reasonable;* ĭt need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808, 105 S.Ct. at 3452 (emphasis in original);

*see also People for the Ethical Treatment of Animals v. Gittens*, 215 F.Supp.2d 120, 131–132 n. 38 (D.D.C.2002). Reasonableness in this context is assessed "in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809, 105 S.Ct. at 3453; *see also People for the Ethical Treatment of Animals v. Giuliani*, 105 F.Supp.2d at 319. That is, "[c]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in the light of the characteristic nature and function of the particular forum involved." *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 650–51, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981).

The case law amply demonstrates that the determination of reasonableness is dependent on the particular circumstances of each situation. For example, in *International Soc. for Krishna Consciousness v. Lee*, the Supreme Court held that a ban on soliciting in airports was reasonable because solicitation disrupted the airport's business of effectively transporting passengers, *see International Soc. for Krishna Consciousness v. Lee*, 505 U.S. at 683–85, 112 S.Ct. at 2708–09, but Justice O'Connor stated in her concurrence that she believed the ban on leafleting was not reasonable. *Id.* at 690–92, 112 S.Ct. at 2713–14. Lower courts have similarly looked at the specific circumstances to determine whether a restriction is reasonable. For example, the court *People for the Ethical Treatment of Animals v. Giuliani* held that a restriction on PETA's entry into New York's Cow-Parade public art exhibit was reasonable, *see People for the Ethical Treatment of Animals v. Giuliani*, 105 F.Supp.2d at

---

9. To be sure, the next sentence of the Standard Procedure states that "[t]his includes use of the community center for meetings, fundraising affairs, and other events." However,

this is only a list of examples of tenant association uses, and does not limit the tenant association to them.

320–333, but the court in *People for the Ethical Treatment of Animals v. Gittens,* held that the restriction on PETA's entry into Washington, D.C.'s similar public art exhibit involving donkeys and elephants was not reasonable. *See People for the Ethical Treatment of Animals v. Gittens,* 215 F.Supp.2d at 131–134.

█ Defendants argue that the restrictions in the Standard Procedure that led to the denial of Daily's request are reasonable because they preserve the WCC for its intended purpose. Def. Mem. at 12–14. According to the NYCHA guidelines issued to community center directors, that purpose "is to offer public housing residents, specifically children and youth, a variety of educational, recreational, social, and cultural activities and programs." Richburg Decl. Ex. A at 1. However, defendants have failed to specify how permitting Daily to conduct her sessions at the WCC would interfere in any way with those purposes. Obviously, if Daily insisted on using the WCC during the hours when regularly scheduled activities are held, or if her proposed sessions would have conflicted with a tenant association activity, RPL 230 meeting, or family event or celebration, it would have been reasonable to deny her request in the light of the purposes of the WCC. But Daily's letter only asked to use the WCC—there is no evidence that she was not flexible as to the time or day.

At oral argument, defendants offered several related reasons why granting Daily's request would interfere with the purposes of the WCC. Defendants stated that by opening the WCC up to Daily, they would have to open it up to all other religious activities, and to many commercial and partisan ones. Tr. at 24. According to Nester, opening it up could also lead to the inclusion of "controversial or hateful" groups or individuals, and of "a plethora of purported religions." Tr. at 27, 30.

In addition, permitting every group to participate could "cause a lot of havoc and problems in these communities." Tr. at 33.

These justifications are not reasonable in the light of the purpose of the WCC. First, the Standard Procedure and NYCHA's resistance to allowing religious groups to use the WCC and other community centers carries an implication of hostility toward religion. In the light of the Supreme Court's consistent approval of the use of government property by religious groups (within certain parameters), any such hostility is unsupported. In addition, any reluctance toward allowing "purported religions" to use community centers is inherently discriminatory and an untenable reason for the restrictions. Second, opening the WCC up to a "multitude" of groups does not interfere with the educational and other community purposes of the WCC, as long as those groups are only allowed to use the WCC at other times. These requests could easily be accommodated on a "first-come, first-served" basis, or based on how many people wanted to participate in each proposed activity. Nor is it clear what kind of "havoc" would be caused by permitting groups such as Daily's (as well as many others) to use the community centers. To be sure, the avoidance of controversy in a nonpublic forum is a valid reason to restrict access to it. *Cornelius,* 473 U.S. at 810, 105 S.Ct. at 3453. However, as long as parties who are controversial do not threaten to damage the WCC or occupy it during hours set aside for its principal purposes, these "controversial" persons also would not interfere with its intended purposes.

In addition, defendants suggested that the NYCHA might be forced to shut down all educational and temporary uses of its community centers if it was required to allow groups such as Daily's to use them.

Tr. at 30, 31. However, it is difficult to imagine that barring tenants of housing complexes from using their community centers would be viable. It is apparent that these centers are used by the community in developments where there is little other common space-tenants currently use them for a wide range of social, educational, and other purposes. It would appear, therefore, that eliminating or reducing access to community centers would lead to significantly more "havoc" than would allowing Daily and other groups to use them. But in any case, the potential for "havoc" or "problems" is not sufficient to justify a regulation that on its face reveals a hostility to a religious viewpoint.

Finally, defendants argue that the court in *Taylor–Wythe* concluded that as NYCHA had "articulated a significant purpose in maintaining [a community center's] availability for its primary function as a recreational and social center for children and adults," that its decision to bar a dissident tenant group from using the community center did not violate the First Amendment. *Concerned Residents of Taylor–Wythe*, 1996 WL 452432, at *5. The court also concluded that NYCHA's decision was not viewpoint discrimination, but that the exclusion violated New York Real Property Law § 230. *Id.* at *5–7. For the reasons articulated above, I respectfully disagree with that court's conclusion.

Accordingly, defendants' denial of Daily's request to use the WCC for Bible study/grief counseling sessions is not reasonable in the light of its purpose.

### Conclusion

Plaintiff has shown both that she will suffer an irreparable harm without a preliminary injunction and a likelihood of success on the merits of her claim that defendants' denial of her request to use the WCC violated the First Amendment. Thus, for the foregoing reasons, plaintiff's application for a preliminary injunction is granted to the extent that defendants are prohibited from completely barring Daily's use of the WCC for Bible study/grief counseling sessions. This relief only requires defendants to make the WCC available for this purpose at times when they would allow it to be used for other "temporary" uses permitted under the Standard Procedure.

SO ORDERED.